## Walker v. Walker, Appellant.

Argued April 27, 1933.

Before TREXLER, P. J., KELLER, CUNNING-

ham, Baldrige, Stadtfeld, Parker and James, JJ.

W. W. *Stoner* of *J. M. Stoner & Sons,* for appellant.

*Oliver K. Eaton,* and with him *J. Merrill Wright,* for appellee.

Opinion by James, J., July 14, 1933:

This appeal involves two questions, (1) whether the evidence presented was sufficient to warrant a decree of absolute divorce, and (2) whether the court had jurisdiction to attach a condition precedent to the right of respondent to receive alimony pendente lite and counsel fees.

On July 3, 1931, the libellant filed his libel in divorce alleging that respondent did by cruel and barbarous treatment endanger libellant's life and offer such indignities to libellant's person as to render his condition intolerable and life burdensome. Libellant filed a bill of particulars to which an answer was filed by respondent, who also filed a cross bill praying for divorce from bed and board. The case came on to be heard before Marshall, J., and resulted in a decree dismissing the libel on the part of the wife for divorce from bed and board and in a finding that the appellee, John L. Walker, was entitled to a decree in his favor upon the second ground alleged in the libel, to wit, indignities to his person.

In the absence of a jury trial, we are required to consider all evidence and express an independent conclusion thereon: Nacrelli v. Nacrelli, 87 Pa. Superior Ct. 162, 288 Pa. 1, 136A. 228. The testimony in this case having been taken in open court and the learned judge before whom the witnesses appeared having had an opportunity to observe their manner of testifying and the evidence produced by libellant and his witnesses being clearly sufficient to warrant the entry of a decree appealed from, the findings of fact by the court below are entitled to respectful consideration. "In the absence of a jury trial the appellate court is required to consider all the evidence and express an independent conclusion thereon. However, where the testimony of the parties to such action is irreconcilably conflicting, the conclusion of the judge who heard them, as to which is to be believed, will not be lightly disturbed on appeal." Koontz v. Koontz, 97 Pa. Superior Ct. 70.

John L. Walker, the libellant, who was a widower, and Mary Jackson Walker were married on August 19, 1926. At the time of their marriage, libellant had two daughters, one aged 14 and one aged 9; and the respondent had been a friend of the family for many years. A short time after their marriage, the parties took up housekeeping at No. 200 Richland Lane, Pittsburgh, Pa., in a house owned by libellant, where they lived until May 11, 1931, when libellant left the house taking with him his younger daughter; libellant's older daughter was at that time at boarding school.

The bill of particulars filed by libellant alleges fourteen separate particulars which finally consummated in the final quarrel and disagreement when libellant left their home. It is not our purpose to narrate in detail the testimony produced by libellant but we shall condense it to show such circumstances as we believe justified the entry of a decree.

A series of disagreements, quarrels and indignities was established by libellant's testimony. In May, 1928, there was a family quarrel, when respondent scratched libellant's face in three or four places, used abusive language and made things so unpleasant that the children and libellant packed their clothes and started to leave the house, when respondent begged them not to do so, said she was sorry and promised not to do those things again. In August, 1929, while on a trip to Missouri, respondent quarreled with the younger daughter Mary, slapped both children, called the children and libellant abusive names, swore at libellant and kicked him several times. In September, 1929, another quarrel arose, when respondent knocked off libellant's glasses and remarked that she wished they might cut his eyes; she kicked him, and bit his thumb so that he was required to visit a physician and the thumb was badly swollen for several weeks. It was on this occasion that libellant suffered a black eye. In October, 1929, there was another quarrel in which respondent called libellant vile names, choked him, struck him, kicked him, and threatened to kill him. In March, 1930, when libellant was discussing their financial condition with his wife, she replied that it was none of her business what his income was, used vile language and cursed him. In August, 1930, while on a trip to Queen City, Missouri, the home of libellant's mother, respondent became incensed at some alleged discourtesy which libellant's younger daughter had shown toward her and insisted upon respondent taking his daughter out of bed at two o'clock in the morning to apologize to respondent; at the same time, respondent insisted that libellant's mother, who was past seventy years of age, get out of bed and apologize for some discourtesy. The next morning, respondent remained in bed until they were serving dinner when she came to the door and commanded libellant to come to her. Libellant replied

that he was serving dinner and said that he would come just as soon as he was through. Respondent then came to the table, grabbed the carving knife out of libellant's hand and slapped his face several times. She started for the younger daughter Mary who went to the living room and was followed by respondent where she held the child in a corner, beat her and slapped her with her fists and hands, called the child a contemptible little hussy and when libellant attempted to interfere, respondent slapped him several times. In September, 1930, on a Sunday morning, the parties quarreled when respondent abused him, kicked him, slapped him, and then left the house in her car and came back a short time later when she continued the quarrel and argument until the latter part of the afternoon when libellant went to his office and slept on the davenport. In January, 1931, there was another quarrel when she used vile language and cursed him. In April, 1931, there was a quarrel when she made threats to kill him. On another occasion, when libellant returned home quite late, he went to respondent's room and found her in bed fully clothed. Respondent then demanded that the younger daughter Mary, who was in bed at the time, be brought to her to make some explanation. Mary was aroused and brought to the room of her step-mother and after being questioned the child said she did not know what respondent was talking about. She called the child a dirty little hussy, a whore and a street walker, said the child was putrid and not fit to be under the same roof. The daughter denied the accusations made and when respondent was asked for the basis of her accusations, she stated that she had obtained the information from Mary's diary. On another occasion, when libellant failed to appear at a reception, she accused him of not wanting to sit with her. A quarrel ensued when they returned to their home and respondent struck the libellant on the head with a hand mirror,

threatened to kill him, and swore at him. In the early part of May, 1931, a quarrel arose over the daughter Mary because she was late in returning from school. She charged the daughter with telling falsehoods, called her a liar and a hussy, picked up a glass from the table and threw it at her and continued to pick up dishes and throw them at her until dishes were scattered all over the dining room floor. Respondent used vile language to both libellant and his daughter. She slapped the child and told libellant that if he had any conversation with the daughter, it would be in her presence and that if either Mary or he said anything about her or her family "she would brain us with the first thing she would get her hand on." She then rushed out of the living room and came back and put something under the cushion of the davenport, which libellant discovered to be a carpenter's claw hammer. On May 11th, the date of the separation, when returned to his home, he found his daughter Mary and respondent in Mary's room and Mary was crying. When he came in, respondent said it was a good thing he came when he did or she would have killed Mary. She had been kicking and choking the child; she had marks on her neck. Respondent said the quarrel had been about Mary's conduct, and that the child had been impudent and saucy. A short time later when Mary was in the kitchen, respondent insisted that Mary stand in a certain spot for more than thirty minutes. Respondent then threw a golf ball at the child. Respondent then said Mary would have to get out of the house and if she did not she would kill her. During this quarrel, respondent's mother called on the telephone and after respondent hung up the receiver she said she was going to get her mother and that Mary had better not be there when she got back or she would kill her, and "that I had better not be there either or she would kill me." During this

quarrel, respondent called Mary vile, contemptible names, and charged her with immorality. Respondent then left the house, whereupon libellant and his daughter packed their personal belongings and left, since which time Mary has been living with a cousin and libellant has been living at a club. Other incidents of a similar nature were testified to, which we will not narrate. A great many of the quarrels grew out of disputes concerning the children. Libellant was corroborated by the testimony of his two daughters, his mother, his employer, a mutual friend of libellant and respondent, and his physician.

Respondent in her testimony admitted many of the quarrels and disagreements with her husband but testified that whatever scratching, kicking or striking she committed or whatever abusive language she indulged in was in retaliation for the abusive conduct that was heaped upon her by her husband; that most of the quarrels arose over the children in her efforts to control and discipline them; she also contended that libellant had improperly conducted himself while on a trip to Virginia and that for the last two years of her married life she had been very nervous as a result of a miscarriage and as a result of constant aggravation over troubles with the children. A short time after the final separation, she wrote a letter to her husband and also went to his office seeking a reconciliation. She wrote a letter to his younger daughter Mary seeking forgiveness, and stated that she was sorry both of them were so stubborn, and asserted her love for the family. She made a personal visit to the older daughter Helen at her boarding school and stated that she wanted her, Helen, to use her influence to bring the father and his other daughter Mary back to live with her.

In his opinion supporting the decree, the learned trial judge said: "The court gathered the impression

that the respondent is a high strung, nervous woman, whose intentions are of the best, but who, nevertheless, was unable to control her temper and who was exasperated by trifling matters. In most instances, matters complained of by the libellant and described by the respondent started from comparatively unimportant causes and the court believes that the respondent sincerely regrets the disagreements which she admits occurred so frequently. ...... We believe that the respondent regrets the separation and would like to have another chance to make her married life a success. The court would be only too glad to afford her the same if it were of the opinion that the attempt would be successful. ...... We believe it would be unfair to all parties concerned to have the family life portrayed by the testimony continued. If there was any evidence in this case to justify the finding that respondent, due to ill health or nervous breakdown which occurred after the marriage, had lost her self-control, we might be prompted to decide otherwise.''

The testimony clearly indicates that each incident standing alone would not be sufficient to justify the granting of a divorce but taking into consideration that these incidents have happened a great number of times and have now reached the point where the family life is continually disturbed and upset by personal humiliation and abuse, not only of himself, but of his young daughter, we are in accord with the judgment of the court below.

It is difficult to conceive of indignities more disturbing than the charges which respondent made against the young daughter of libellant involving her chastity, which were persisted in on several occasions and even at the hearings respondent attempted to justify her accusations by the production of a copy of Mary's diary; the correctness of some of the entries contained in the diary was denied by Mary.

We have carefully examined the testimony and find no justification for respondent's accusations; even her counsel states "that the little girl meant no harm and did no harm." As a step-mother of this young girl, it was her duty to nurture and protect the child, and not ruin her life by baseless charges. The unwarranted charge of immorality made by respondent against the young daughter of the libellant would be as great an indignity to a loving father as if a charge of infidelity had been made against libellant himself. The testimony clearly shows that respondent was a woman possessed of an ungovernable temper, particularly when dealing with the children, and in her rage she committed many of the offenses charged against her. A reading of the record indicates, as was stated by the court below, that respondent's testimony is more a matter of explanation than denial.

It is impossible to lay down a general rule for the determination of what indignities render the condition of the injured party intolerable. It has been held by many courts (see 14 Cyc. 625) that they may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient: Breene v. Breene, 76 Pa. Superior Ct. 568, 572; Koontz v. Koontz, 97 Pa. Superior Ct. 70, 73.

In Breene v. Breene, supra, at pages 571 and 573, the court held: "While it is impossible for any human tribunal to accurately gauge the individual responsibility of the parties for the unfortunate resulting conditions, the only thing we can do is to follow the rule founded upon our decisions, to determine the accuracy of the decree from which the appeal is taken. ...... Assuming that each party has offended

against the established proprieties that are expected in the marital relation,—even under such unfortunate conditions there must be some point, beyond which human indulgence can not be expected to submit, and resort to the courts may rightly be had to sever a relation no longer endurable, and which makes a further living together intolerable and life burdensome. To hold that there can be no legal relief from such a deplorable condition would likely result in such physical violence as would jeopardize the life of one of the parties. We are not called upon to balance such an account of mutual delinquencies, but only to determine which party is the least open to the charge of causing the situation.''

An examination of the testimony convinces us that the conduct of the respondent was of such a character as brings it clearly within the rule above laid down. The testimony clearly brings this case within the long line of cases which have established that indignities which consist of vile epithets, cursing, striking, kicking, slapping, throwing dishes, calling vile names, in conjunction with wholly unwarranted charges of immorality against the young daughter of libellant, are of such a nature and character as to render the condition of the libellant intolerable and life burdensome. We believe the record fully justified the entry of the decree by the court below.

The second question involved in this appeal relates to the order made by the court below in reference to alimony pendente lite. After the filing of the final decree on June 30, 1932, a petition for alimony and counsel fees was filed on September 8, 1932, and an answer was filed thereto. The court thereafter handed down an order directing that libellant ''shall pay to Mary Jackson Walker the sum of fifteen hundred ($1500) dollars in full payment of all claims for alimony, maintenance and/or support from May 11, 1931 until the final disposition by the appellate courts

...... and (libellant) shall pay to the attorneys for said Mary Jackson Walker ...... the sum of five hundred ($500) dollars; as a condition precedent to the payment of the said fifteen hundred ($1500) dollars by the said John L. Walker to the said Mary Jackson Walker, as aforesaid, the said Mary Jackson Walker shall on or before September 17, 1931 move out and surrender up possession of the house, garage and premises at No. 200 Richland Lane, Pittsburgh, Pa., owned by said John L. Walker, to the said John L. Walker and shall turn over to the said John L. Walker all of the furniture ...... of any kind whatsoever in said house and garage and on the premises ......; said fifteen hundred ($1500) dollars to be paid, seven hundred fifty ($750) dollars when said Mary Jackson Walker shall have moved out of the premises, ...... and seven hundred fifty ($750) dollars four months after the date of such removal and surrender of possession of the premises and furnishings as aforesaid.'' In the petition which respondent filed to have the within appeal advanced for argument, she averred that she refused to surrender possession hoping ''to bring about a reconciliation between herself and her husband and had anticipated and yet anticipates that such reconciliation may yet be brought about.''

This decree was in form largely as alleged in respondent's answer, made in an offer by counsel for libellant to counsel for respondent and accepted by them and then refused by respondent.

Prior to the marriage, the libellant had purchased the home on Richland Lane and all the furniture and furnishings were owned by libellant or his daughters. From the date of the separation of the parties up to the present time, the respondent has occupied the home and at the time of filing the petition for alimony it was occupied by respondent, her mother, sister and brother-in-law, while the libellant had been compelled

to provide another home for himself and his daughters. The home property is subject to a mortgage of $18,000. Libellant submitted several financial statements which appear in the record, concerning which he was examined at length. It appears from these statements that from May 1931 until June 1932, the date of the trial, the libellant had paid to or for the benefit of the respondent the sum of $4,213.98. These payments included interest on mortgage, taxes, fire insurance on the house, gas, light, telephone, water, watchman, maintenance of the house, personal expenses of respondent, cash of $900 to Mrs. Walker, and, in addition, libellant had paid to respondent's attorneys the sum of $500 as counsel fees. At the trial, it was shown that Walker's total assets were $33,135, and his total liabilities, $86,003.61. No possible purpose can be served by going into detail as to the various items of income and expense submitted to the court below and of which the record shows no dispute. We have carefully examined these statements and believe that there was no abuse of discretion on the part of the court in making the order appealed from. Appellant's chief contention is that the lower court had no right to attach to its award a condition which would practically deny the benefit of such award to respondent. Appellant loses sight of the fact that the occupancy of the home by respondent with members of her family was in itself a substantial allowance from the estate of the libellant, whereas, he was required to and did pay the interest on the mortgage and all maintenance charges; during the year preceding the hearings libellant contributed more than $4,213.98 which directly and indirectly was for the benefit of the respondent. Appellant's counsel concedes that he finds no authority exactly in point on this question but if the court below in its discretion had the right to grant alimony

pendente lite, it naturally had the right to place such conditions upon the granting of such order as in its judgment provided for the reasonable support of respondent and did not impose an undue burden upon the libellant. In the present instance, if the condition attached to the order is ineffective, the respondent would have received the sum of $1,500 in cash and her counsel would have received $500, while the responsibility for paying the interest on the mortgage, the fixed charges and the maintenance of the property would still have been placed upon the libellant. "The amount to be allowed a wife, respondent in divorce, for her support pendente lite and counsel fees is largely in the discretion of the court of common pleas, subject to the condition that the allowance for support should not substantially exceed one-third of the income from the property and labor of the husband." Ray v. Ray, 89 Pa. Superior Ct. 566, 567. In Schofield v. Schofield, 51 Pa. Superior Ct. 579, 582, the court said: "The orders, the refusal of which the appellant assigned for error, were matters with regard to which the court below was vested with discretion. Neither the order itself nor the attachment to enforce it were matters of right: Stock v. Stock, 11 Phila. 324; Breig v. Breig, 34 County Court 465. It was proper for the court in passing upon these matters to consider all of the facts which had been developed during the proceeding." But this is entirely within the discretion of the court, both as to amount and duration, and not subject to review: Waldron v. Waldron, 55 Pa. 231, 235. In the determination of the proper amount, much must be left to the sound discretion of the court below: Lynn v. Lynn, 68 Pa. Superior Ct. 324, 327; Neagley v. Neagley, 59 Pa. Superior Ct. 565, 572; White v. White, 106 Pa. Superior Ct. 80, 161 A. 463.

The order made was alternative in form, leaving

respondent ·to choose between the acceptance of the sum of $1,500 or remaining in the home, which, in view of the circumstances of the parties, we hold not to be such an abuse of discretion as would justify a reversal. Decree and order affirmed.