Campbell *v.* Campbell, Appellant.

Argued November 17, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Ralph N. Kellam,* with him *Herbert G. Marvin,* for appellant.

*Raymond A. White, Jr.,* for appellee.

OPINION BY JAMES, J., March 1, 1937:

On January 27, 1934, Edgar Campbell filed a libel in divorce against his wife, Viola Black Campbell, alleging cruel and barbarous treatment and indignities to the person. The master filed a report recommending an absolute divorce on the ground of indignities to the person, but denied a divorce on the ground of cruel and barbarous treatment. Respondent's exceptions to the report were dismissed, the report approved and a final decree entered, from which decree this appeal followed.

Our recital of the testimony shall be confined to the main features of the indignities alleged, which consisted of accusations of infidelity and improper conduct. Libellant and respondent, now aged 38 and 43 respectively, were married in Wilmington, Delaware on May 17, 1917, and a daughter Barbara, now aged 12, was born of the marriage. They lived at various places in the states of Delaware and New Jersey, the last place being Wenonah, N. J., until June 1932, when

libellant moved to Swarthmore, Pa., and at the time of the libel was a resident of the City of Philadelphia. Respondent continued to live in New Jersey and was living at Wenonah at the time of the hearing. For several years the parties lived a happy married life, when, according to libellant's testimony, respondent developed the trait of stating that he was taking interest in daughters of neighbors. When they lived at Woodbury, N. J., she accused him of seeing a girl on the outside and going with her, as a result of which it was finally necessary to sell their home and move to Wenonah. Shortly afterwards, respondent accused her husband of going with a girl named Shoot. During 1928 and 1929 libellant's business, which was production manager for an insurance company, required him to be away all day and sometimes over night, and invariably upon his return would be accused of having immoral relations with other women. These accusations would continue until two or three o'clock in the morning. On one occasion the daughter, when seven years of age, accompanied her mother in following libellant. On that occasion the wife accused him of being out with another woman. In August 1931 she accused him of having immoral relations with other women, one of whom was a secretary of an attorney in Woodbury. On that occasion she kicked and scratched him, threatened to shoot him and persisted in her accusations until two or three o'clock in the morning, when he was obliged to go out and sleep in his automobile. She admitted to libellant that she had called Robert C. Hendrickson, a lawyer and senator of the State of New Jersey, and discussed with him libellant's going with his secretary and admitted also calling Warren G. Curry, who worked for the same company as libellant, and told him that he and her husband were running around together. In June 1932 she again charged him with being out with other women; that

she had seen him with two girls in his car pulling into the woods and charged him with being a whore master. He slept in the car that night and left in the morning on a business trip. On his return, she admitted she had visited the chief of police to have him arrested. He then moved to his mother's home in Swarthmore. He further stated that respondent told him she did not care for him, and that it would suit her if he would get out, all she wanted was $100 a month, and he produced an envelope which contained figures placed there by his wife specifying what she could do with this amount of money. In August 1932, in a drug store in the presence of other people, she stated that libellant's mother was paying him to live with her and that he was still going with the secretary of the state senator and having immoral relations with her.

Warren G. Curry was called and testified that on two occasions, respondent called him on the telephone in reference to the secretary of Senator Hendrickson, and on one occasion charged that he and her husband were running around with girls. In June 1932 respondent came to the office and inquired about her husband and charged them again with running around with other women. Joseph Robinson, a police recorder of Wenonah, was called on the telephone by respondent and went to her home where she told him libellant was going to Mexico with a young lady from Robert C. Hendrickson's office. Robert C. Hendrickson testified that respondent called him several times on the telephone; she stated her husband was going to Mexico with some blonde; and she called at his office to check up on her husband and particularly as to his relations with his stenographer. He testified there was a feeling of bitterness between his stenographer and the libellant and from his knowledge of libellant, there was no foundation for respondent's accusations or her queries. Lawrence G. Pollock testified that respondent inquired

of him what he knew about libellant's going out with other women.

Libellant's testimony was to the effect that he had been seriously ill from a nervous breakdown, but since the separation his health had materially improved. During their married life, the family maintained two automobiles, a servant for much of the time, and the wife had charge accounts in some of the larger stores in the City of Philadelphia. His testimony was not in any manner affected upon cross-examination, which was confined largely to the financial transactions between libellant and respondent.

Respondent denied making any accusations about her husband's running around with other women and asserted that she had implicit confidence in his moral relations; denied that she ever called her husband any vile names, or ever kicked or scratched him or threatend to shoot him. She admitted that he took her on many business trips but that he refused to take her out socially. About November 1931 he began to make comparisons of her with other women, stating that she had an ugly old face, other girls had it over her and he didn't want to have anything to do with her. She had called the police during the month of June 1932 because he had threatened to go to Mexico, but denied that she told the police whom she thought he was going with. She admitted writing the figures on an envelope introduced in evidence by her husband. She testified that her husband did not drink or gamble or use his money for other women, and was away on nights only on business trips. She claimed that her husband carried on flirtations with other women in her presence, but she never remonstrated.

In corroboration of her story, respondent called her father and two maids, who had been employed for short periods at their home. The father testified that he heard libellant say that respondent was ugly and fat

and that "other girls had it all over her a hundred times;" but he never heard him curse her. One of the maids testified that libellant slapped respondent in the face, and the other testified she heard various arguments and on one occasion libellant threatened to leave if respondent's sister came for dinner. The young daughter testified that she never saw her father strike her mother or heard him call her names; that the mother usually started the quarrels and the father would frequently leave the house in the middle of the night. Since the separation, the daughter has been living with the mother, but usually spent week-ends with her father. We regard it unnecessary to detail the testimony as to the alleged broken finger or the transactions relating to the home, which, however, from the standpoint of credibility, give added weight to libellant's evidence. The testimony as to respondent's conduct after libellant's withdrawal from the home was relevant solely for the purpose of shedding light upon respondent's behaviour prior to the separation.

From our review of this record—which we are required to do and reach our independent conclusion— we are of the opinion that the conclusion reached by the master and the court below was correct. The testimony of libellant was fully corroborated by other witnesses on many important points; that they were business associates might have in some measure affected their testimony, yet, reading it as a whole, it bears the earmarks of truthfulness. From respondent's own testimony, we find her husband to have been of exemplary conduct and a good provider, whose main weakness was flirtations with other women in her presence, of which she made no complaint. The record fully justifies the conclusion that the respondent, by her constant accusations of immoral conduct on the part of her husband, offered such indignities as to render his condition intolerable and life burdensome.

196

The principles applicable to a charge of indignities to the person have often been stated by our courts, more recent cases being *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Upperman v. Upperman,* 119 Pa. Superior Ct. 341, 181 A. 252. Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient. Accusations of immoral conduct have been recognized as indignities in *Cavazza v. Cavazza,* 102 Pa. Superior Ct. 312, 156 A. 629 (where the indignity alleged was a charge of sexual intercourse with a daughter), in *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446 (unwarranted charges of immorality against the young daughter of the libellant) and in *Sleight v. Sleight,* supra. (where the main charges were immorality with other women). From our examination of this testimony, we are of the opinion that the libellant and his witnesses, by a clear preponderance of the evidence, established such indignities as entitle him to a decree of divorce on that ground.

Decree affirmed.