## Morris *v.* Morris, Appellant.

Argued April 13, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-FELD, PARKER, RHODES and HIRT, JJ.

*Walter W. Riehl,* for appellant.

*William J. Graham,* with him *Clyde P. Bailey,* for appellee.

OPINION BY STADTFELD, J., June 28, 1939:

This is an appeal from the decree of the Court of Common Pleas of Allegheny County, granting a divorce to the appellee upon the ground of adultery.

On June 21, 1937, the appellee presented his petition to the court for divorce from his wife, the appellant, charging (1) cruel and barbarous treatment and (2) indignities. On July 30, 1937, appellee filed an amended libel charging the appellant with adultery with one Lester Crossman. In the appellee's bill of particulars filed on September 3, 1937, he withdrew the charges of cruel and barbarous treatment and indignities to the person and relied solely upon the ground of adultery.

The appellant appeared and filed a responsive answer denying the charge of adultery.

Hearing was held before MARSHALL, J., (E. W.) now retired, at which time, two witnesses, a husband and his wife, for libellant testified to seeing the act of adultery at different times which act was denied by the respondent and co-respondent.

Other testimony was offered at the hearing showing that the co-respondent worked around the rooming house of the respondent for a period of time before and after the alleged act of adultery and at a later date rented a room at the rooming house of the respondent for a period of time.

On December 29, 1937, a decree of divorce was granted to the appellee. This appeal followed.

The parties were married in 1912 and separated in 1924 when libellant left respondent. In 1932 respondent was supporting herself by conducting a rooming house.

The charge of adultery was supported by the testimony of Mr. and Mrs. Sipe who occupied rooms at respondent's house, from April to December 1932. They testified to having seen Crossman and respondent sleeping together.

Mr. Sipe testified that he with his wife and the respondent and co-respondent ate their Thanksgiving meal at the rooms of the respondent on Thanksgiving day of 1932. That upon the co-respondent arguing about the cost of the dinner, Sipe and his wife left and were joined later by the co-respondent who stayed with them until about 3:00 A. M. and upon leaving forgot his hat and coat, which were taken by Sipe to the respondent's apartment, where the respondent and co-respondent were in bed. Within a month following, the Sipes removed from the respondent's home and on December 22d, all met at the Mt. Washington incline. The co-respondent threatened Sipe and told him to forget what he saw and then knocked him out. Mrs. Sipe testified that on two dates, she visited the room of the respondent

to use the phone and saw the respondent and co-respondent in bed. She also testified that she and the respondent "went half" on the Thanksgiving dinner and that she and the respondent did the shopping; that during the meal the co-respondent argued about the cost and that she and her husband left for their own apartment where the co-respondent joined them and played cards until about 3:00 A. M., when the co-respondent left. His hat and coat were discovered the next morning and Mrs. Sipe gave them to her husband to return; that after they had moved from the premises all met at the incline and the co-respondent told Mr. Sipe to forget what he saw at the house, to which Sipe demurred, and both she and her husband were assaulted.

Parts of the testimony are corroborated by the respondent and co-respondent. All witnesses agree that the telephone was either in the respondent's room or in the hall and was used by the tenants. The respondent and co-respondent both admit that a fight ensued upon their first meeting with the Sipes, and the co-respondent admits that Sipe, after being hit, "was on the curb and fell back," and both agree that they were arrested, and they both agree that they were together on an errand for the respondent. That the talk and fight must have concerned incidents seen at the house by Sipe is corroborated by Crossman's own testimony that Mrs. Sipe called him a "dirty pimp" at the first meeting.

The trial judge was impressed with the testimony of Mr. and Mrs. Sipe. He said in his opinion: "Mr. and Mrs. Sipe gave the impression of being truthful witnesses. The substance of their testimony was not unreasonable; when considered in connection with other facts not in dispute it becomes thoroughly credible." When witnesses who are competent and equally interested flatly contradict each other, the conclusion of the judge who heard them as to which is to be believed, is not to be lightly disturbed: *Koontz v. Koontz*, 97 Pa.

Superior Ct. 70; *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446.

According to Lester Crossman's own testimony, his first appearance at the home of respondent was in 1932 as a laborer and continued daily about the house as a laborer through 1932 and part of 1933 when in April, he took up his abode and lived there until the spring of 1935, all the while continuing to work about the home as a laborer, early and late. Testimony indicates that he did all sorts of work in and about the home, "everything from washing clothes to cooking and scrubbing floors" in old clothes and pajamas and shoes off, as renting agent, cook, censor of decorum, gardener and painter and doorkeeper and ate his meals there.

It is conceded by the respondent and co-respondent that the latter (Crossman) was in respondent's home constantly from 1932 to 1935. He admitted papering and painting practically all the rooms, building cupboards, installing water pipes, plastering, and repairing boiler. Respondent admitted he did the repair work and her own witness admitted seeing him there every day and at night and working in the garden.

While both respondent and co-respondent pretended that the latter was at the home as a workman, he could name but three other persons who employed him during the same four-year period and that for very minor jobs, and during this period respondent's only income was from renting rooms and her finances were so low that the telephone was disconnected. A witness for respondent testified that the respondent called the co-respondent by his first name, and he testified that for a time the telephone was in his name.

He denied that he ever did respondent's washing or she did his, but admitted that she now does the washing for him and his brother and sometimes goes to his house for it and returns it.

Mrs. Nellie Stonehouse, mother of Mrs. Sipe, testified that she visited her daughter in 1932; that the co-re-

spondent while living with the respondent, answered a knock at the door about 8:30 A. M., clad in pajamas and in his bare feet and was berated by the respondent for going to the door in that attire and he promptly returned to the room where respondent was. Other witnesses testified that he rented rooms to prospective tenants; and that he told a tenant to make a little noise when entering a room so as to give notice of entering.

Respondent denied that the co-respondent ever ate at her table, and one of respondent's witnesses testified she never saw it, but the co-respondent admitted having lunch and meals on Sundays and other days.

The respondent and co-respondent denied the accusation and offered as witnesses other tenants of the building. Their testimony, however, was of a negative character only.

Upon an independent examination and consideration of the entire record, we agree with the court below that the testimony justifies a decree in favor of the libellant.

Crossman's presence and activities in respondent's house were so unusual as to require explanation. The explanation that his capacity was merely that of a paid workman is not credible. Respondent's income was entirely too meager to employ a mechanic or handy-man almost constantly for several years, and no legitimate workman would continue to work without pay as Crossman says he did. It is also incredible that with wages due and unpaid, he would pay his room rent in cash instead of crediting it against the amount for wages.

Quoting from the opinion of the court below: "We have, then, a case of adultery made out by the testimony of two witnesses, neither of whom contradicts the other in any material particular, and supported by collateral circumstances of a convincing character. Since the collateral circumstances are verified by respondent's proof and only evidence of a negative character is offered to contradict the positive proof of the two eye-witnesses,

libellant's charge has been sustained by a preponderance of evidence and a decree should be granted." Our independent examination and consideration leads us to the same conclusion.

The assignment of error is overruled and the decree affirmed.