Karpiel *v.* Karpiel, Appellant.

252

Argued April 19, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADT-
FELD, PARKER, RHODES and HIRT, JJ.

*Walter J. Laska,* with him *Alexander J. Bielski,* for appellant.

*Harold K. Brooks,* for appellee.

OPINION BY STADTFELD, J., June 28, 1939.

This is an appeal by Mary Karpiel from a decree in divorce at the suit of her husband, Joseph Karpiel. The libel charged (1) that the respondent had, by cruel and barbarous treatment, endangered the life of libellant, and (2) offered such indignities to the person of libellant as to render his condition intolerable and life burdensome. A bill of particulars was filed by libellant.

A responsive answer was filed by respondent, denying the allegations in the libel and bill of particulars.

The case was heard June 17, 1938 by ELLENBOGEN, J., who, on September 23, 1938, granted a decree on both grounds charged in the libel. The appeal to this court was taken on September 29, 1938. The opinion of the lower court was filed on March 7, 1939, in which the court states: "The decree, as entered contained a finding that respondent has 'by cruel and barbarous treatment endangered the life of libellant.' We had no intention to so find. This finding was erroneously inserted in the decree. The decree should be amended to eliminate this finding, so that the divorce decree will be based solely upon the finding that the respondent has offered such indignities to the person of libellant as to render his condition intolerable and his life burdensome. We cannot make this amendment now, because an appeal has been taken and a writ of certiorari issued by the Superior Court, which removes the case from our jurisdiction." We will, therefore, consider the testimony in relation to the charge of indignities only. It is our duty to consider the evidence de novo, pass on its weight and upon the credibility of witnesses, and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been established: *Huston v. Huston,* 130 Pa. Superior Ct. 501, 197 A. 774.

Libellant and respondent were married on June 10, 1910, in Galicia, then a province of Austria, and now a part of Poland. About a year later they emigrated to the United States and first settled in Manifold, Washington County, Pennsylvania. Then they came to Allegheny County, first living in Moon Township, and then moving to 531 Boquet Street, in the Borough of Carnegie, where they have lived for about 22 years. Three children were born of this marriage of whom two are now living, one named John, aged 23, and the other William, aged 18 years.

The libellant is a motorman, employed for many years by the Pittsburgh Railways Company. By keeping down his expenses and by working overtime, he was able to save a considerable amount of money. In 1922 he purchased the house in Carnegie in which he and his family had been living, for $9000, and paid for it out of his own earnings. In addition to that he was able to save a considerable amount of money in the bank and in a building and loan association.

The testimony shows that the parties did not get along well together from the time they moved to Carnegie, some 22 or 23 years ago, but their serious difficulties began about 1931. Up to that time, libellant turned over all his wages to respondent, but in 1931 he made extensive repairs and improvements to his home, for which part of his wages was used, and the balance was turned over to respondent. Thereupon, respondent began to find more serious fault with him and to accuse him of drinking, gambling, going with other women, and spending his wages for these things; and this course of conduct, with non-support charges, neglect, threats, physical encounters and other indignities, continued with increasing violence until the final separation in 1937.

According to the testimony of the libellant, he worked on different turns, and at extra times, and when he came home at night was not allowed by respondent to put on a light while undressing and going to bed, or to find something to eat. Respondent would not get him anything to eat, telling him to go and make it himself. She continually accused him of drinking and of being drunk when he came home from work, and when he came home late after working extra, she refused to believe that he was working and accused him of running around with other women. She refused to permit libellant to have his friends and relatives in their home, ordering those who did come to leave, and calling them and the libellant, vile and opprobrious names. Many times she

took a bread knife and pointed it at libellant's chest and body, threatening, "I am going to kill you right there." These threats continued for six or seven years, and in 1932 or 1933 she actually stabbed him in the ribs. She refused to permit libellant to see their sick daughter and accused his brother and sister-in-law of bewitching the child, causing her illness and subsequent death. This daughter died in 1932, and while going to and returning from the funeral, respondent nagged the libellant and kept jabbing him in the ribs with her elbow, due to the fact that libellant's brother, John, was in the cab with them, at the same time referring to his brother as a "devil," and insisting that libellant "Get that devil out of here." Following the funeral the parties returned home, where respondent refused to permit libellant's brother to come into the house, calling him a devil and saying, "You ain't going to come in my house. I don't want you," whereupon the brother left but subsequently returned to the house, where their friends were gathered for post-funeral refreshments, and while libellant was talking with him at the door, respondent threw a pail of water on them, and then obtained a broom with which she threatened to strike them, but which libellant took from her, after which she spat on them. Prior to 1932, libellant had been giving all his wages to respondent, but about that time he repaired and improved their home, for which he retained and used part of his wages, giving her only what was left over, and thereupon respondent brought suit against him in the county court for non-support, where she accused him of spending the money for gambling and drinking and obtained an order of court against him. Following the non-support hearing, respondent took $165 from libellant's pockets and later took $100 of his savings from a trunk. Respondent refused to permit libellant to heat water with which to wash himself upon returning from work, and at one time in 1936, took a pot of water which he was trying to heat and spilled it over him and then hit him

on the head with the pot, at the same time threatening, "I will fix you, I will get you," and also kicking him in the privates with such violence, causing him such pain, that he did not know where he was. During these altercations the parties' children were often present, and on one occasion, the eldest son grabbed libellant by the neck and threw him down and he and respondent beat and kicked libellant very severely on his legs and face, causing him to bleed profusely, after which they called the police and had him arrested. Libellant inherited some money from Europe for which he received a check for $650 drawn in his and respondent's name and respondent refused to endorse it for him, although it was his inheritance alone, until he first obtained half of the amount of the check and gave it to her. On numerous occasions in 1933, 1934 and afterwards, respondent threatened to tell libellant's employer that he was drinking and spending all his money on women and thus get him discharged from his job, and in 1936 she told him she hoped he would get injured or killed at his work, at one time saying, "You can go to hell and break all of your bones so you wouldn't come back no more." Again in 1936, when libellant came home from work he obtained a cup of coffee and then went upstairs and turned on the light, when he was commanded, "Don't you turn that light on. I want to sleep. Don't put that light on. Turn it out." Libellant then lay down on the bed, and because of a minor physical reaction from accumulated intestinal gas, respondent jumped off her bed and grabbed him in the privates, from which he was only able to extricate himself and save himself from serious injury by kicking her; and on numerous occasions at about this same period, she kicked him and grabbed him in the same place and also threatened to stab him there with a knife. Respondent was a nagging wife, libellant testifying that, "She was nagging me all the time, nagging me, nagging me. I couldn't stand it." About three or four years before the trial, respondent

quit preparing meals for libellant, making up his bed and washing his clothes, and did not perform these duties thereafter. He stated that "She didn't do nothing for me." Respondent would not allow the boys to bring libellant's lunch pail to him, and later, when she quit doing anything for him, she stopped preparing his lunch and ordered him to buy his lunches instead. She left his bed about five or six years before their final separation, although she slept part of this time in his room and part of it in the boys' room. She would not permit the boys to talk with libellant. In 1936 and before, she refused to let him eat anything at home, and hid and locked up the food and cooking utensils to prevent him from eating or preparing food at home. Finally, upon coming home from work in 1936, libellant found that respondent had changed the locks on the doors at home and would not let him in, and about the same time, she threw his clothes and trunk out for him, refusing even to permit him to enter the house to get them; he has not been home since that time. Libellant was afraid of what respondent might do to him and her treatment of him affected his health, causing him to lose weight and to be nervous, which continued until he began living away from home, after which he gained ten pounds. Libellant was corroborated in much of his testimony by other witnesses.

John W. Karpiel, libellant's brother, an employee of the Pennsylvania Railroad Company, at Carnegie, testified as to respondent's constant nagging of libellant, her accusations that libellant was gambling and playing cards and holding out money from her, her abuse and jabbing of libellant in the ribs while in the cab going to and from their daughter's funeral, and her charges that libellant's brother and his wife had bewitched their daughter, her refusal to let libellant's brother come in the house after the funeral and her throwing water and spitting on them at that time, and her calling libellant abusive names.

Tony Borek was in the parties' home for a short time about Easter of 1934 or 1935, as a friend of libellant, when respondent became angry at libellant and began nagging him, calling him names, and telling him she didn't want his friends there. She accused libellant of being drunk and said, "You dirty drunk, don't bring any friends in here." Mr. Borek had known libellant since 1922 and says he was not drunk at the time and was not a drinking man, although he takes a glass of beer now and then and a very little whiskey. He also testified that the home provided by libellant was a good home, so far as he could see.

The respondent herself corroborated much of the testimony of the libellant, particularly as to her violent dislike and distrust of his relatives and friends, her refusal to permit them in their home, her fault-finding after he stopped turning over his entire wages to her in 1931, her accusations of drinking and dissoluteness, and her locking him out of the house. She confirmed libellant's testimony that she changed the locks on the doors of their home to keep him out.

When asked on direct examination when she first started to have trouble with her husband, respondent replied, "My husband's brother make the whole trouble," referring to John Karpiel. She admitted that John had not been in their home since 1931, but still blamed him for their troubles, and insisted that libellant visited John "all the time," saying "I know. I watch my man go." She admitted that after the daughter's funeral, "I tell the brother not to come in my house," and blamed him for the trouble that arose at that time, and again, when asked by her counsel as to her husband's treatment of her, she accused his relatives, saying, "...... my husband was talked to by his relatives. I know that of my own knowledge. They talked against me;" and then, on cross-examination, she testified: "Q. You didn't like Joe's brother and their relations, did you? A. I no want them to come to my house."

The testimony indicates that libellant was a steady worker, never missing a day's work in a work week of seven days, and often working extra. He bought and paid for their $9,000 home with the income from his labor. His children were educated through High School, and also in music, for which libellant paid, and he purchased musical instruments for them. He and respondent had money in the bank and a building and loan association, all saved from the wages earned by him. He has continued without interruption for more than twenty years to hold down a position of great responsibility with the Pittsburgh Railways Company, in which the lives of many people are entrusted to his care, and in which drinking is prohibited and is a prime cause for discharge. He is unquestionably industrious, thrifty and responsible, and his record clearly substantiates his own testimony and that of his witnesses that he drinks very little and never to excess, and refutes all the testimony of respondent and her witnesses that he was addicted to drunkenness and traveled with drunkards.

Quoting from the opinion of the trial judge: "While it is true that respondent took the stand and denied, in general terms, that she mistreated libellant, and while she claimed that the fights between them were provoked by the husband, we cannot credit her testimony. We have had an opportunity to observe both of them closely and judge their character and veracity. We were impressed with the worthiness of libellant and with his quiet and positive way of testifying. We believe his testimony to be true and are obliged to reject the testimony given by the respondent as not being worthy of belief ...... Having observed the libellant and the respondent and the other witnesses to this case, their demeanor and their manner of giving testimony, we have no hesitancy in stating that in the case before us, libellant has made out a clear and convincing case and has sustained the charge of indignities to the person by com-

petent, certain, clear and satisfactory evidence, entitling him to a decree of divorce on that ground."

Quoting from the opinion of Judge JAMES in *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446, at p. 541: "In the absence of a jury trial, we are required to consider all evidence and express an independent conclusion thereon: *Nacrelli v. Nacrelli,* 87 Pa. Superior Ct. 162, 288 Pa. 1, 136 A. 228. The testimony in this case having been taken in open court and the learned judge before whom the witnesses appeared having had an opportunity to observe their manner of testifying and the evidence produced by libellant and his witnesses being clearly sufficient to warrant the entry of a decree appealed from, the findings of fact by the court below are entitled to respectful consideration. 'In the absence of a jury trial the appellate court is required to consider all the evidence and express an independent conclusion thereon. However, where the testimony of the parties to such action is irreconcilably conflicting, the conclusion of the judge who heard them, as to which is to be believed, will not be lightly disturbed on appeal' *Koontz v. Koontz,* 97 Pa. Superior Ct. 70."

In order to be entitled to a divorce on the ground of indignities to the person, libellant must show that the respondent persisted in a course of conduct which rendered libellant's condition intolerable and his life burdensome. The law on this point is well summed up in *Campbell v. Campbell,* 126 Pa. Superior Ct. 190, 196, 190 A. 536, where the court said in an opinion by Judge JAMES, that: "The principles applicable to a charge of indignities to the person have often been stated by our courts, more recent cases being *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69; *Upperman v. Upperman,* 119 Pa. Superior Ct. 341, 181 A. 252. Indignities may consist of vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and es-

trangement; but slight or irregular acts of misconduct
are not sufficient. Accusations of immoral conduct have
been recognized as indignities in *Cavazza v. Cavazza,*
102 Pa. Superior Ct. 312, 156 A. 629 ......, in *Walker
v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 466 ......
and in *Sleight v. Sleight,* supra ......"

After a careful examination and consideration of the
entire record, we have come to the same conclusion as
did the court below in relation to the charge of indigni-
ties, and the decree modified as suggested by the court
below in its opinion filed, is affirmed.