Bisceglia *v.* Bisceglia, Appellant.

Argued May 9, 1939.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Charles G. Notari,* for appellant.

*Alexander P. Lindsay,* with him *Alexander H. Lindsay,* of *Sherriff, Lindsay, Weis & Hutchinson* and *John C. McGinnis,* for appellee.

OPINION BY STADTFELD, J., June 28, 1939:

This is a divorce proceeding filed by the libellant, the husband, on the grounds of cruel and barbarous treatment and personal indignities. The bill of particulars of alleged offenses covers a period from 1917 to 1937. The respondent filed a responsive answer, denying all charges.

The parties were married April 26, 1906, have lived in Allegheny County during the entire period of their marital relation and have six children, all of age. They lived together as husband and wife until October 26, 1936, when libellant withdrew from the common residence because of threats upon his life which caused him to take up a separate residence.

The respondent filed proceedings in desertion and non-support court and obtained an order of court against the libellant. On May 17, 1937, she again applied to the court asking that the libellant be compelled to furnish her with a home, which the court refused to do. Enraged by this, she hurried to the room in which the libellant was living and secreted herself therein. He arrived home a short time later and, as he was unlocking the door, he was met with a bullet fired by his wife from a revolver with which she was

waiting for him. The revolver was fired very close to the door. The bullet went completely through the door, penetrated through the heavy overcoat worn by libellant and lodged against his inside coat. Libellant was stunned for a moment but quickly regained his composure and fled to a nearby saloon where he called the police. When the police arrived, they had to break in the door in order to get to the respondent who had locked herself in the libellant's room. Libellant was taken to the hospital and discharged when it was found that the bullet had spent itself in piercing the door and outer clothing of the libellant without causing serious injury to him.

The case was heard before McNAUGHER, J., of the common pleas court who, in an opinion filed, granted a decree on both grounds. This appeal followed.

According to libellant's testimony, the respondent, beginning in 1917, mistreated him almost continuously, calling him vile and opprobrious names, threatening his life, refusing to wash his clothes or serve his meals, and generally making his life miserable and unbearable.

Things went from bad to worse until the incident of October 26, 1936. Libellant testified that he came home to find all the lights on and respondent in bed asleep. He turned off the lights and went to bed himself only to have respondent jump out of bed and again turn on the lights. When his son arrived home, the mother and son started to hit libellant. She wanted to hit him with a rolling pin. Their daughter, Theresa Bombara, came from downstairs in time to hear respondent call libellant a number of vile names and save him from abuse with the rolling pin then in the respondent's hands. The daughter, Mrs. Theresa Bombara, so testified. This incident was also testified to by another daughter, Emma Bisceglia. Her testimony fully corroborates the testimony of libellant and Theresa Bombara. Part of the testimony by this witness is as follows: "Q. Did she make threats concerning your

father? A. I remember on October 26th I was in bed when he came down the steps and he (libellant) was in the hall and she (respondent) followed him in the hall and she said, 'I won't be satisfied until I see you in the street without a cent.' This was all said in Italian—'And when I get through with you they won't be able to find a piece of your body.' ...... Q. How was your father dressed? A. He had on his underwear. Q. How was your mother dressed? A. She had on a nightgown. Q. Where did your father go? A. He went back into the hall and then down in the cellar, I guess. Q. Do you know how long he stayed in the cellar? A. Five or ten minutes. Q. And then— A. We were worried, we thought something was going to happen. Q. Did you stay in your bedroom all the time? A. Yes, I stayed in bed. Q. And did you see the rolling pin that your sister had? A. I saw it when she brought it down in the room, and she said she would sleep on it. Q. Where did she put it? A. She put it under the bed— just exactly where I don't know—but under the bed some place. Q. That is between the mattress and spring? A. Yes."

The daughter, Mrs. Bombara, testified in part as follows: "A. He prepared his own lunch. He used to repair houses down on Logan Street and he would get up real early in the morning and make his own breakfast and make coffee for us kids, too, to go to school. She never would get up to do anything. Then he would go down to Logan Street and sometimes walk to save a car check and pack his lunch to bring with him to eat at noon because he started to work at the Pennsylvania Railroad at two o'clock. He would come home and have to make his own lunch, pack his own lunch to eat at six o'clock at work. Then he would go to work and wouldn't come home until twelve or one o'clock after work. ...... She talked loud and threatened him. Q. What kind of threats? A. She said the only time she would be glad was when she saw his

body floating down the river or his body out in the street. She always said things like that. Q. You say she said that to you? A. About him. She meant that about him. Q. How often would she say these things to him? A. Nearly every time he was present. ...... Well, he always tried to be peaceful and live with her right but you can't. It is impossible to live with a person like that and he—he had a bed up in the attic with no mattress on and he would sleep on the springs with no covers or nothing in the winter. He even slept in the kitchen on the chair in the dark, and he never used the electric or gas. Q. Why? A. Because she wouldn't let him use the electric or gas. We all had to sit in one room until it was time to go to bed and all the lights had to be out. We had to walk around in the dark most of the time." Referring to the night of October 26, 1936, she testified: "The lights were all on in the hall, living room and bedroom. As I was going up the steps I couldn't help but hear. He said, 'Why don't you get out of the house. You don't bring anything home,' my brother said. She said, 'Let's kill him, he is no good here,' and as I happened to go in the room she had the rolling pin raised above her and was ready to strike him and I grabbed the rolling pin from her hand in back of her and I slept on it for two nights. It was a long rolling pin. Q. How long did you stay in the room? A. Until he left. I followed him down the steps and I says to her, 'I don't care what you say to him in words as long as you don't kill him,' and when I happened to get in, when I got in the room, that was his chance to get out because they was fussing trying to get the rolling pin from me. Q. Who tried to get the pin from you? A. Both did, brother and mother, and my dad went down to the cellar in his long winter underwear and I went in the bedroom and locked the door because I was frightened too, and I slept on the pin for two nights, and she must have made the bed the third day and took it and I never seen it since."

A careful reading of the testimony leads to the conclusion that the respondent, by a long course of conduct, compelled the libellant to leave the common domicile.

Coming down to the incident of May 17, 1937, when respondent tried to shoot libellant, it can best be visualized by quoting from the latter's testimony: "Q. What happened on or about May 17, 1937? A. I wasn't feeling good on that day and I received a letter from the non-support court. It was a notification for the case that would come up in court on May 17, 1937. Q. Did you see her on May 17, 1937? A. I saw her in court. Q. And what court was that? A. Non-support court. Q. Did she say anything to you following the hearing in non-support court? A. After she had asked the court, Judge McKim, to give her a home, the Judge says, 'I give you $6 a week but no home.' Q. And following that, what happened then after that? A. Well, the tipstaff in court told me to go in and sit down on a chair and my wife and my son, as they were walking out of the court room, they said, 'We will come to kill you tonight.' Q. Was anything else said? A. No, they put her out. Q. What did you do after that? A. Well, I waited in court to sign for the $6 a week for non-support, for alimony. Q. After you left the court what did you do? A. I got on a taxicab because I couldn't walk and I went home. Q. And where was your home? A. 4911 Penn Avenue. Q. How come 4911 Penn Avenue when before you were at Morewood Avenue? A. Well, I left Morewood Avenue because she threatened to kill me in bed. Q. And came where— and went where? A. 4911 Penn Avenue. Q. Who was living there with you? A. Nobody. There was another family on the second floor and another family on the third floor, and I was on the first floor. Q. You were on the first floor alone? A. Yes, I had two rooms on the first floor. I was alone. Q. And how long were you living alone there before May 17th? A. Well since

October 26, 1936 and I am still living there. Q. This was the home you went to after this hearing? A. Yes, after the hearing in non-support court. Q. Tell us what happened there at this time? A. Right inside of this—on the first floor there is thirty-six feet of hallway. I says, 'Thank God, I arrived at home and I can go to sleep.' I had a padlock and as I put the key in the padlock I pulled the padlock from the door. And at the same time I received a bullet over here (indicating a position near the lapel hole of the coat). Q. How long was this hall? A. Thirty-six feet long. Q. Where was the door to the room? A. There is a shoemaker shop first. Then I have to walk through the hall and then at the end of the hall there is a door leading into the room. Q. How wide was this hall? A. Four feet wide. Q. You say it was locked with a padlock? A. Yes. Q. Where was the padlock? A. Near my door. Q. How far up the door? A. About five feet high, the same height that would indicate my button hole, the button hole on the lapel of the coat. Q. And you had unlocked the padlock? A. And as I opened the door the bullet hit (Question read) A. Yes, sir. Q. Was there a handle on the door? A. No, I just had the padlock on the door. Q. Well, as you unlocked the padlock, what happened? A. As I opened the padlock, then the bullet hit me through the door. Q. Did you hear any noise? A. Yes, sir. Q. What? A. B-o-o-m! Q. Where did the bullet come from that struck you? A. It came from my room, from inside my room. Q. What did you do? A. As the bullet hit me I fell in the door and the door opened. Q. Did you see anybody in the room? A. I saw my wife with the revolver in her hand and she says, 'Are you going to give me the house?' Q. What did you say? A. I didn't say anything. Q. What did you do? A. And then I pulled the door shut again because I was afraid she would shoot me again, and then I ran out and she ran after me, and she had a revolver and a knife in her hands. Q. Where

did you go? A. I went in the saloon two doors from there. Q. Then what did you do? A. I couldn't speak. The saloonkeeper ......"

The daughter, Mrs. Theresa Bombara, corroborates her father. She testified that on the night of the incident, at about 8:30 she heard her mother say, "I shot my husband and I am glad of it."

The uncontradicted facts support libellant's testimony. It was admitted that a bullet was fired; there was a bullet hole in the door at a height of about forty-eight inches which was the height of libellant's coat. A photograph of the bullet hole in the door was produced and offered in evidence which showed the same and powder marks which would indicate that a revolver was fired within about one foot of the door. There were no powder marks on libellant's clothes which would have been the case if the respondent's story of the accidental discharge of the gun was true.

A disinterested witness, one of the policemen called at the time of the shooting, Martin John McIntyre, testified that the coat worn by the libellant at the hearing with the bullet mark still in the lapel was the same coat worn by the libellant at the time he was shot and that when he first saw it, which was immediately following the shooting, it had the bullet marks in the left lapel.

The respondent was found locked up in this room with the revolver in her possession and refused to admit the officers to the room so that they had to break in the door in order to obtain admission.

Another daughter, Mrs. Angeline Geraci, testified in corroboration of her father as to the general treatment of the latter by her mother. She was not at home on the night of the shooting.

Another daughter, Emma Bisceglia, corroborated her father in relation to the general treatment of him by the respondent, as well as in relation to the incident of October 26, 1936.

Respondent denied categorically the testimony of libellant and his witnesses. Her story is full of inconsistencies and contradictions. In one part of her testimony in relation to the shooting incident, she stated that after the gun went off, the libellant put the gun on top of the table. Later, she testified that the libellant placed the gun in the dresser drawer. In answer to a question by the court, she testified as follows: "Q. You also said when he first came out and got in the argument with you he took you by both hands—are you mistaken about that—and you showed me by grabbing both of your shoulders, as I recollect it. That didn't happen then, is that right? A. When he came out of his bedroom he had both hands full but as soon as he came out of the bedroom he find mantlepiece and he threw stiletto and he said, 'Get out', and I said, 'No, I no get out', and he grabbed one hand. Q. Then he did not grab you with both hands at any time? A. No." According to her testimony, the relations between her and her husband were most congenial and affectionate and everything was lovely all the time. She simply overstated her case and warranted the statement in the opinion of the court below: "The respondent's demeanor on the witness-stand was not at all convincing; on the contrary it led us to the conclusion that she was not a credible witness."

On behalf of respondent, a daughter, Elizabeth Altmare, testified and denied the use by her mother of the vile epithets against the libellant. She did, however, state in answer to the question, "When did the trouble first start in this family between your father and mother? Well, it really started just about October, 1936. It was right after that everything seemed to start quick, and it certainly ended quick, too."

The only other member of the family who testified on behalf of respondent, is the son, Dr. Fred A. Bisceglia. In regard to his testimony, we quote from the opinion by McNAUGHER, J.: "The respondent called

her son, a physician, to support her contention that she did not mistreat her husband. This witness generally made a favorable impression upon us but for several years immediately prior to the bringing of this action he was for the most part attending school and on duty at a hospital and not present in the household to observe the relationship between the mother and father."

The other witnesses were former tenants for a limited time in libellant's house when the parties lived together, or personal friends who were casual visitors. Their testimony was entirely negative in character.

In reading over libellant's testimony and that of the children who testified on his behalf, we were much impressed with their candor and apparent truthfulness and we are led to the same conclusion as that of the trial judge who saw and heard the witnesses. We believe the testimony fully supports the charges.

"In the absence of a jury trial, we are required to consider all evidence and express an independent conclusion thereon: *Nacrelli v. Nacrelli,* 87 Pa. Superior Ct. 162, 288 Pa. 1, 136 A. 228. The testimony in this case having been taken in open court and the learned judge before whom the witnesses appeared having had an opportunity to observe their manner of testifying and the evidence produced by libellant and his witnesses being clearly sufficient to warrant the entry of a decree appealed from, the findings of fact by the court below are entitled to respectful consideration. 'In the absence of a jury trial the appellate court is required to consider all the evidence and express an independent conclusion thereon. However, where the testimony of the parties to such action is irreconcilably conflicting, the conclusion of the judge who heard them, as to which is to be believed, will not be lightly disturbed on appeal.' *Koontz v. Koontz,* 97 Pa. Superior Ct. 70.": *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446.

The assignment of error is overruled and decree affirmed.