## Viney, Appellant, *v.* Viney.

Argued November 12, 1942.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT and KENWORTHEY, JJ.

*Robert D. Baskervill,* for appellant.

*Elias Magil,* with him *Martin R. Freedman* and *Herbert S. Levin,* for appellee.

OPINION BY STADTFELD, J., December 22, 1942:

This is an appeal by the libellant from an order of the Court of Common Pleas No. 4 of Philadelphia County, which, in an opinion by President Judge THOMAS D. FINLETTER, dismissed the libel.

The parties were married May 4, 1925. They lived together until August of 1928, when they separated for the first time. They were reconciled in January, 1929, for a period of three weeks and then again separated. They were reconciled again in May of 1932, but after seven weeks together separated once more and since that time have lived in separate homes. However, libellant continued to visit respondent at the home of the latter's mother and on week ends stayed overnight, the parties having marital relations on those occasions. The last such visit was in 1937.

On January 31, 1938, libellant filed his first proceeding for divorce on the ground of desertion, as of March term, 1938, No. 35, the proceeding being docketed in the Court of Common Pleas No. 2 of Philadelphia County. That court dismissed the libel on the ground that no desertion was shown.

Two weeks after the dismissal of his first suit, libellant started this second proceeding on the ground of indignities. The master recommended a decree of divorce, but the exceptions filed on behalf of respondent were sustained by the court of common pleas. Libellant then appealed.

It has frequently been ruled by the court that an action based on indignities must set forth and establish not merely a series of isolated occurrences, but a course of conduct.

We quote from the opinion in *Deutsch v. Deutsch,* 141 Pa. Superior Ct. 339, 14 A. 2d 586: "It is well settled, however, that it is not with isolated occurrences that the law concerns itself in determining whether a divorce should be granted upon this ground, but only with indignities so repeated and continuous as to constitute a course of conduct which renders the complaining party's condition intolerable and life itself a burden. Such indignities we have frequently said may consist of vulgarity, unmerited reproach, habitual con-

tumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement; but slight or irregular acts of misconduct are not sufficient: *Sleight v. Sleight,* 119 Pa. Superior Ct. 300, 181 A. 69.

"It is not of a single act that the law speaks in the clause under which this case falls, but of such a course of conduct or continued treatment as renders libellant's condition intolerable, and life burdensome. Divorces ought never to be easily obtained, for marriage is the most sacred of human relations, and should never be dissolved without clear proof of imperious reasons. Indignities provoked by the complaining parties are of course no ground of divorce, unless the retaliation is excessive: *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350.

"Domestic disputes are not a cause for divorce unless they have the magnitude and importance of indignities such as would render one's condition intolerable and life burdensome: *Katz v. Katz,* 102 Pa. Superior Ct. 551, 157 A. 362. Even violent quarrels which were participated in by both parties are not sufficient: *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821."

Libellant charges respondent with treating him with disdain in the presence of others, with calling him vile names, with living with another man, with one occasion of violence, with neglect of housework, with sexual coolness and with making accusations of adultery against him. These charges will be discussed in turn.

To libellant's suggestion that respondent called him vile names, the respondent entered a denial that she ever used vile language, except under one circumstance:

"Q. Well, what was the nature of the language that you used toward him?

A. There wasn't any language for me to use to-

wards him, unless it was nice language. I didn't do anything wrong to Bill.

Q. Well, did you ever call him any vile names?

A. Well, when he called me I called him back."

If libellant provoked the name-calling, or it occurred in the midst of quarrels participated in by both parties, it is in no wise a proper instance of indignities on the part of respondent. In *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350, one of the indignities urged was that respondent broke the frame containing the marriage certificate. However, it was admitted that this was in the course of a quarrel in which the two parties struggled physically for possession of the certificate. Hence, in holding that this incident could not be urged in support of divorce, the Supreme Court, in an opinion by Mr. Justice LINN, said at p. 82: "Indignities provoked by the complaining party are, of course, no ground of divorce unless when the retaliation is excessive."

In *Mathias v. Mathias,* 114 Pa. Superior Ct. 444, 174 A. 821, where a decree granted by the lower court was reversed by the Superior Court, one of the indignities urged, precisely as in the case at bar, was that respondent was guilty of profane language. In pointing out that this was not worthy of consideration, Judge CUNNINGHAM said: "Appellant denies she was with this man, and, as to the profanity, asserts it was provoked by libellant's false accusations. Indignities provoked by the complaining party are not grounds for divorce unless the retaliation is excessive (*Richards v. Richards,* supra; *Kissinger v. Kissinger,* 83 Pa. Superior Ct. 231), and we do not so consider appellant's conduct here."

Only two instances of corroboration were attempted on behalf of libellant. Both relate to the name-calling. One was by libellant's friend, Robert Mickey, who testified that in October, 1928, during one of the periods

of separation between the parties, he was in a room adjoining one in which libellant was talking to a woman and the witness overheard the woman calling the libellant various names. However, this testimony was obviously of little value to prove even the single act involved, inasmuch as the witness testified that he did not see the woman, never heard her talk before and on a later occasion, when libellant introduced him to the respondent, he was unable to say that the respondent's voice was the same as that of the woman whom he heard berating the libellant. Under the circumstances, the testimony of this witness in no wise corroborates the libellant's story that the respondent used vile language to the libellant.

The other corroborating witness offered by libellant was Frank L. Mackey, who also testified, so far as corroboration is concerned, only to one incident. He testified as to an incident that is supposed to have occurred in May 1932, when the parties were quarreling and when the respondent supposedly used vile language. The same witness testified that on every other occasion that he saw the parties together, the conduct of the respondent was excellent. On this he said: "...... I mean, their behavior towards each other was so swell and everything went along very fine—that is, on our occasions out ......"

He again emphasized that her conduct on the occasion of this one incident was different from what it had always been otherwise by saying: "So, she went on just like some one that I didn't know; I mean, she seemed to be a different person entirely from the person I had been socializing with."

The testimony of libellant as to the use of vile language by respondent was entirely without corroboration except as to one incident, and the witness testifying to that incident makes it clear likewise that on other occasions the conduct of the respondent was

above reproach. Respondent herself denies knowing either of libellant's allegedly corroborating witnesses and indicates that her own use of language which was in the slightest improper followed only on provocation by the libellant in the same manner. That there was a continuous course of conduct is really rebutted by the testimony of libellant's own witness.

As a matter of fact, libellant himself indicated that respondent generally treated him well and certainly in the presence of others did nothing to humiliate him. Libellant testified:

"Q. How did she treat you when you were out?

A. She treated me fine.

\* \* \* \* \*

Q. Do you intend to convey the impression that when you were out with her in company she treated you all right but that when you were alone together things were not so good—is that the impression you intend to convey?

A. In this particular instance, yes, in 1932."

That the charge of living with another man, one Craig Davis, was entirely unjustified is supported by the fact that no corroboration whatsoever was offered. Manifestly, if that were the situation, corroboration would have been easy to obtain. It would have been equally easy for libellant to base his suit for divorce upon the ground of adultery, were there the slightest merit in the story.

There is no suggestion that the respondent used personal violence on the libellant. The nearest conduct to that which the libellant can offer is the story that in 1932 "she packed her little steamer wardrobe trunk and pushed it down the stairs." However, he admits that it did not hit him, that he dodged it, and that he moved the trunk around between the dining room and the kitchen. Since respondent had packed her trunk, the obvious inference is not that she was attempting

to throw the trunk at the libellant but that she was attempting to get it down the stairs. This assumes the truth of the story told by libellant that she "pushed it down the stairs." There is nothing directly in the testimony to suggest that she was trying to strike the libellant with it. At best, it represents an isolated instance.

Although libellant testified that "at times" the respondent was untidy, his own testimony shows that this was occasional only. The charge was flatly denied by the respondent and no attempt at all was made by the libellant to corroborate his story.

Although libellant attempted to build up a picture of an improper interest on the part of respondent in libellant's own friend, Craig Davis, whom libellant —not respondent—had taken into their home as a boarder, the evidence on this point is very weak; there is no attempt whatsoever at corroboration, and even libellant's own story does not make out a case of indignities. If any physical relations had occurred between them, the most obvious recourse open to the libellant would be a suit for divorce on the ground of adultery.

As to the charge of sexual coolness, we quote from the opinion of Judge FINLETTER: "The extent of this sexual coolness may be judged from the fact that libellant himself testified that he had intercourse with his wife up until a few days of their last separation. And the respondent testified that they had intercourse in 1937."

There was also the corroborating testimony of respondent's mother and the witness Elsie Orange on this point. They both testified that until sometime in 1937, libellant regularly visited the respondent at her mother's home and spent the night with her there. This was not denied by the libellant, although he was called for rebuttal testimony.

The testimony by libellant that respondent "always accused me of women, women, and especially this one, Mae Wesley," came as rebuttal testimony and not as libellant's testimony in chief. It followed on respondent's direct statement that the differences between her husband and herself arose because he ran around with other women and particularly with a Mae Wesley. Respondent testified further that after libellant received a message from Mae Wesley, libellant packed respondent's things and called a moving van to take them up to respondent's mother's home. Respondent denied that she left voluntarily in June of 1932. That in effect, corroborated libellant's admission that he got respondent's trunk and paid for the moving van.

Libellant also stressed the fact that respondent had once been shot by a woman friend or associate who admittedly was not of good character. While respondent admitted that she knew that associate, one Edna Carroll, had been arrested, there is no evidence in her answers to that question that she knew at the time of the association, of that arrest. There is certainly no evidence that she continued the association after learning of her friend's bad character or that in any way it became notorious or humiliating to the libellant, or that libellant ever objected to or reproached the respondent with the association.

Consideration of the cases cited by respondent indicates that the testimony produced by libellant in this case has fallen far short of the standards required.

Aside from the fact that in the case at bar there is no corroboration, the conduct testified to even by libellant certainly involves no facts within the principles of the cases cited.

Under the authorities libellant's case has not presented facts sufficient to justify a divorce on the ground of indignities, even if, his testimony were to be believed; that in this case the alleged course of conduct

is not even corroborated but is, in fact, rebutted by one of his witnesses and is definitely denied by the respondent; and libellant's entire case should be viewed with serious suspicion as an afterthought in view of the fact that the events now related by libellant all occurred prior to his previous unsuccessful action on the ground of desertion.

We quote from the opinion in *Deutsch v. Deutsch,* supra: "All of the alleged indignities complained of in this proceeding occurred prior to the former divorce action, but were not then presented as grounds for divorce. Their production now seems an afterthought and affects libellant's good faith."

A careful examination of the entire record leads to the same conclusion as reached by the court below.

The assignments of error are overruled and decree affirmed.