Stinson *v.* Stinson, Appellant.

Argued October 6, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Milton S. Margolis,* for appellant.

*T. R. Griffith,* with him *John M. Kurtz, Jr.* and *Griffith & Kurtz,* for appellee.

OPINION BY DITHRICH, J., January 14, 1949:

After overruling exceptions to the master's report the learned president judge of the court below granted libellant a decree in divorce on the ground of indignities. On this appeal by respondent it is incumbent on us to examine the evidence and form our own independent judgment as to whether or not it does in fact establish a legal cause for divorce, giving of course the fullest consideration to the report of the master because of her personal contact with the witnesses. *Helon v. Helon,* 157 Pa. Superior Ct. 587, 43 A. 2d 398. Upon such independent review we have concluded that, notwithstanding

the recommendation of the master and the approval of her report by the court below, the decree cannot be sustained.

Respondent, no doubt, was a very difficult person for libellant to get along with, but most of his complaints were of a trivial nature not worthy of the weight given to them by the master and the learned president judge of the court below. For example, the master's report contains an account of an instance when respondent, who had been working in a factory, said, after returning from work one evening, she was going to a beauty shop for a "hairdo." Libellant said jokingly, "This is pay day, maybe I am going to be treated." When respondent retorted that she wasn't working and earning money for any man "This hurt the feelings of the libellant so that he went out of the house and walked around for a while to recover from his hurt." Anyone with such sensitive feelings should hesitate a long time before entering into a relationship that at its best is for better or for worse.

Another page in the report is given over to a detailed account of an occurrence that took place one evening when libellant and respondent, with another couple, went into Philadelphia from nearby Downingtown for dinner and a movie. Respondent chided libellant for wasting his money on a cocktail, complained about the food which she didn't particularly like and, after walking four or five blocks to the motion picture theater, objected to standing in a long line because she was tired and not in good health and said "the show would be no good anyway after they got in." She more than likely was right about that. So they went home to bed without seeing the picture. To find that "As a result of this experience and the habit of the respondent to think . . . only of herself . . . libellant and respondent were ignored by their friends and relatives, and lost all friendly associates," is to lay such stress on what was at most a selfish and inconsiderate act on the part of the respond-

ent as is out of all proportion to the weight to be given such conduct.

Both the master and the court below in our opinion attached undue significance to the fact that, although respondent was able to get up and get breakfast when her sister was visiting them, she insisted on libellant's getting it when they were alone. Even if she had not only neglected but had even refused to get her husband's breakfast, we have held that "If the wife sleeps late in the morning and is remiss in her household duties, that is not in itself a ground for divorce": *Schreiber v. Schreiber*, 99 Pa. Superior Ct. 123, 126.

We likewise feel that undue significance was attached to the fact that after respondent had remonstrated with her husband about going around with a woman, who was a fellow worker in the factory where he was employed, and had been told by him that he "would go with whom he pleased and when he pleased," she found them together in the woman's apartment under what, to say the least, were suspicious circumstances, and called their employer to tell him about the raid on the woman's apartment and the arrest of her husband. In our view it is just as logical and reasonable to infer that she wanted to break up the affair between him and the other woman, as that she wanted to have him lose his job. *Manzi v. Manzi*, 112 Pa. Superior Ct. 332, 171 A. 92.

In *Fawcett v. Fawcett*, 159 Pa. Superior Ct. 185, 48 A. 2d 23, we said speaking through RENO, J. (p. 187): "Nothing is better established in our law than that ill health both explains and excuses a wife's conduct, and that the acts of a spouse resulting from ill health do not furnish a ground for divorce. [Citing cases.]" We there held that the learned court below had fallen into grave error in finding that, although respondent "is ill and nervous," her malady "does not explain nor excuse her conduct." Here, we find that the learned court below fell into like error in holding that "respondent's con-

duct . . . [could not be] attributable to physical or mental illness."

In the period of four years from 1940 to 1944 respondent underwent four major operations. Without going into detail, the operations were of such a nature as to clearly establish that the respondent's complaints as to illness were not functional but organic. And even if they had been merely functional, they would not amount to indignities. Cf. *Meinel v. Meinel*, 109 Pa. Superior Ct. 143, 167 A. 379.

The lot of the husband in this case doubtless has been an unhappy and troublesome one, requiring no little patience and forebearance on his part, but in the marriage ceremony he and respondent took each other "in sickness and in health"; and, according to the master's report, it was not until after they "had been married some five or six years, [that] the respondent alleging that she was not feeling well, began to neglect her household duties." The neglect of her household duties seems to have been the underlying cause of their marital discord. Yet, "five or six years," as noted by the master, would bring their married life up to 1940 when the first of the four operations on respondent, an appendectomy, was performed. That marked the beginning of the decline in health of a comparatively young woman that progressively continued until she had, according to the testimony of a qualified psychiatrist, who among his other qualifications is an instructor in psychiatry in the medical school in the University of Pennsylvania, become psychoneurotic by the time she and libellant separated.

We agree with the learned president judge of the court below that "The conduct in question meets the test laid down by our authorities as respects its effect on libellant"; but we disagree with him that it was "inspired" and "motivated by her desire and intention of hurting libellant rather than being the result . . . of respondent's condition, physical or mental."

The decree is reversed and the libel dismissed.