Steinke, Appellant, *v.* Steinke.

Argued June 16, 1975. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*Stanton C. Kelton, III,* for appellant.

*Robert O. Steinke, Jr.,* appellee, *in propria persona,* submitted a brief.

OPINION BY JACOBS, J., October 28, 1975:

This is an appeal from the decree entered below dismissing plaintiff-appellant's complaint for divorce a.v.m. Because we find that appellant's evidence did establish grounds for divorce due to indignities offered by the husband, Robert Steinke, to the appellant, we reverse.

The record discloses the following facts. The parties met in May, 1971, when Robert was 20 and Cecilia was only 16. In August of that year they eloped to Maryland and were married on August 4. Neither Cecilia nor her mother, who testified in her behalf, noticed anything unusual about Robert at that time. However, shortly after the marriage, Robert informed appellant that he never wanted to grow up and he started wearing diapers and rubber pants. On occasion he would request appellant to change the soiled diapers, which she refused to do. Appellant testified that she was shocked by this behavior and found it impossible to discuss the situation with Robert. Their families and friends apparently knew nothing about it.

In June, 1972, appellant's daughter was born and Robert stopped wearing diapers. A few months later he expressed a desire to dress as a woman, and thereafter would wear women's clothes around the house. He obtained some information by mail regarding transexualism which detailed the treatments and surgical possibilities available to effect a complete change in sex. As the idea of becoming a woman grew on him, he began to visit doctors and psychiatrists with the view of developing himself as a woman. To this end he began taking hormones.

For a while appellant maintained hope that Robert would overcome this phase but as it persisted she resolved to seek outside help. With the advice of her mother, she took her husband to see a psychiatrist who would help him overcome his desire to change his sex. After a few visits, however, Robert decided he was receiving no help

and discontinued the treatment in favor of that provided by the doctors who were guiding him in a six month program leading up to the anticipated sex change surgery. He began to assume the total identity and appearance of a woman, with the help of the hormone pills, at work and in public as well as at home. For the first time the situation became known to the friends of the couple.

Robert testified that at this time, when he was assuming all feminine attributes possible, short of surgery, he felt that the whole experiment was a trial period during which he sought to resolve his inner conflict, and that the ultimate operation was not a certainty. Nevertheless, after three months of the six month treatment had elapsed, appellant demanded that he leave their home. On February 10, 1974, he moved into a separate apartment, continuing to live as a woman to the extent of calling himself "Karen" and appearing at a support hearing in June of 1974 in women's attire. In July of that year when the doctors informed him that he was not a fit subject for the operation, Robert had already reached that conclusion on his own. He stopped the treatments and, feeling himself cured, he resumed living as a man.

In July, 1974, about the time Robert was abandoning the desire to become a woman, appellant filed her complaint in divorce alleging indignities. A hearing was held before the court in October at which Robert appeared without counsel, and very ably contested the divorce in his own behalf. In December he sent a letter to the judge who heard the divorce withdrawing his contest. The lower court found that sufficient grounds for divorce were not established because the husband's conduct stemmed from psychiatric disorder.

In reviewing this case, we are required to make an independent study of the record. See *Dougherty v. Dougherty*, 235 Pa. Superior Ct. 122, 339 A.2d 81 (1975); *Barr v. Barr*, 232 Pa. Superior Ct. 9, 331 A.2d 774 (1974). In matters of credibility, however, the lower court's

judgment is entitled to great weight as it is the lower court which has had the opportunity to observe the witnesses, their demeanor and inflection, and is thus in a better position than the reviewing court to settle the questions on that issue. *Dougherty v. Dougherty*, supra; *Sells v. Sells*, 228 Pa. Superior Ct. 331, 323 A.2d 20 (1974).

The Act of May 2, 1929, P.L. 1237, §10(1)(f), *as amended*, 23 P.S. §10(1)(f) allows the innocent and injured partner to a marriage to obtain a divorce from the bond of matrimony where the other spouse "[s]hall have offered such indignities to the person of the innocent and injured spouse, as to render his or her condition intolerable and life burdensome." Indignities have not been defined by the law, but rather conduct alleged to be productive of indignities has been evaluated together with the peculiar circumstances of each case. *See Boyer v. Boyer*, 183 Pa. Superior Ct. 260, 130 A.2d 265 (1957); *McLaughlin v. McLaughlin*, 170 Pa. Superior Ct. 516, 87 A.2d 101 (1952). Appellate courts have attempted to draw general guidelines thought to be instructive in shaping the offense of indignities. It has thus generally been determined that such conduct must constitute a course of behavior which is humiliating and degrading, inconsistent with the injured individual's position as a wife, making that condition intolerable and life a burden to her. A single act of indignity is not sufficient, but a course of treatment "of such character as to render the condition of any woman of *ordinary sensibility* and *delicacy of feeling* intolerable and her life burdensome" will present grounds for divorce. *Commonwealth ex rel. Whitney v. Whitney*, 160 Pa. Superior Ct. 224, 228, 50 A.2d 732, 734 (1947) (emphasis original). Such conduct is understood to manifest the spirit of malevolence, hate and estrangement which has come to replace natural love and affection in a marriage and is central to a charge of indignities. *Barr v. Barr*, supra; *Sells v. Sells*, supra.

That the appellant-wife in the present case has come to find life with her husband intolerable and burdensome does not indicate unusual sensitivity or extraordinary delicacy on her part. It is certainly to be anticipated that a reasonable woman might react to her husband adopting not only the clothing, but the full physical appearance of a woman, by becoming shocked and repelled. This Court has recognized that unnatural sexual conduct or excessive and unusual sexual demands represent indignities making a spouse's condition intolerable and life burdensome. Where such conduct can be established, we have held that divorce is appropriately granted. *See Crissman v. Crissman*, 220 Pa. Superior Ct. 387, 281 A.2d 719 (1971) (homosexual conduct of husband grounds for divorce); *Diehl v. Diehl*, 188 Pa. Superior Ct. 491, 149 A.2d 133 (1959) (excessive sexual demands of wife grounds for divorce); *Krug v. Krug*, 22 Pa. Superior Ct. 572 (1903) (unusual sexual demands of husband grounds for divorce). The record in the present case details facts which make relief for appellant's unhappy condition particularly appropriate: she married her husband at the very young and immature age of 16, without the advice or blessing of her family, when they had known each other only a few months, and she was unaware of her husband's predilections. Furthermore, the conduct of the husband is of such a nature as to cause revulsion in a young and inexperienced woman, tending to create an atmosphere where affection sours and loathing grows in its place.

In addition, the husband's conduct indicates a lack of concern for his wife's well-being and neglect of his responsibility to her and the child. The appellant testified that it was humiliating to her that her husband would appear in front of her friends and associates, as well as in public places, in feminine attire. A course of conduct which is humiliating and degrading to a woman has been held to provide evidence sufficient in itself to support

the allegation of indignities. *DiFabio v. DiFabio*, 200 Pa. Superior Ct. 381, 188 A.2d 838 (1963); *Simons v. Simons*, 196 Pa. Superior Ct. 650, 176 A.2d 105 (1961); *Boyer v. Boyer,* supra. Also the testimony of both parties substantiates the finding that the husband's behavior naturally provoked a strained and distant relationship wherein communication and other intimacies ceased. Persistent neglect of one spouse by the other has been found to manifest indignities. *Priest v. Priest,* 162 Pa. Superior Ct. 232, 57 A.2d 437 (1948); *Commonwealth ex rel. Whitney v. Whitney,* supra. Finally, appellant testified that she was concerned for her young daughter who exhibited some questionable social behavior, possibly due to the influence of the husband. Whereas this alone would not support an allegation of indignities, concern for the wholesome development of the child provides additional support for the appellant's decision to seek a dissolution of her marriage. This Court has recognized that an indignity to a child can sometimes be an indignity to the parent and the mistreatment of children can be grounds for divorce. *Crissman v. Crissman,* supra; *Walker v. Walker,* 109 Pa. Superior Ct. 539, 167 A. 446 (1933); *Cavazza v. Cavazza,* 102 Pa. Superior Ct. 312, 156 A. 629 (1931).

The lower court, however, held that grounds for divorce were not established due to the finding that the husband was acting under the compulsion of a psychiatric disorder. It is true that conduct springing from mental ill health cannot constitute indignities because it must be regarded as unintentional and lacking in the spirit of hate and estrangement which is the heart of the charge of indignities. *Barr v. Barr,* supra; *Boggs v. Boggs,* 221 Pa. Superior Ct. 22, 289 A.2d 479 (1972); *Fawcett v. Fawcett,* 159 Pa. Superior Ct. 185, 48 A.2d 23 (1946). " '[This] doctrine must not, however, be pushed to extremes. The guilty spouse cannot excuse . . . mistreatment amounting to indignities by the shallow excuse of nervousness or irritability unfounded in any specific ailment. The

law still considers the parties as masters of their own conduct unless legal insanity has intervened . . . or recognizable and definable disease has usurped the will, and the ill-treatment is but the normal manifestation of the derangement of health.' " *Dougherty v. Dougherty,* supra at 130, 339 A.2d at 85, *quoting,* 2 A. Freedman, *Law of Marriage and Divorce in Pennsylvania,* 700-01 (2d ed. 1957).

In the present case the husband attempted to explain the conduct complained of as being symptomatic of mental illness. He produced no witnesses or other evidence to corroborate his own testimony that he suffered from mental disease. On the contrary, both he and appellant testified that the doctors and psychiatrists he consulted recommended he persist in this course of conduct, and administered hormones and medication to effect a physical change preparatory to a sex change operation. Since no cure was prescribed or treatment recommended other than continuation and even increase of the same behavior, it is difficult to believe there was any recognizable illness in the first place. Furthermore, the husband discontinued treatment, after only a few brief sessions, with the psychiatrist the appellant had selected who was attempting to modify the husband's behavior. Refusal to submit to medical treatment to correct a disorder destructive to the marriage has been held to be grounds for divorce. *Fiorilli v. Fiorilli,* 202 Pa. Superior Ct. 529, 198 A.2d 369 (1964).

In this day of growing acceptance of transvestite and homosexual behavior, with sex change operations a commonplace occurrence in many areas, we hesitate to accept the view that mental imbalance is displayed when an individual experiments with one of these concepts. In reference to the case at bar, we remain unconvinced by the husband's unsubstantiated testimony that he was compelled by mental illness to adopt the patterns of living he displayed. Rather than mental illness, we must view

the husband's predilection as the indulgence of a private fantasy. As such, it cannot excuse the indignities complained of, and can constitute grounds for divorce. In this context it is instructive to note that the conduct here at issue does not parallel that reported in prior cases where divorce was denied due to the emotional instability of the defendant. Those cases review incidents stemming from clearly ascertainable physical maladies requiring surgery, *Stinson v. Stinson,* 163 Pa. Superior Ct. 497, 63 A.2d 413, *allocatur refused,* 163 Pa. Superior Ct. *xxv* (1949), or describe violent acts of a wild and strange nature, requiring that the perpetrator be institutionalized. *See, e.g., Simons v. Simons,* supra; *Braun v. Braun,* 186 Pa. Superior Ct. 260, 142 A.2d 361 (1958); *Glass v. Glass,* 164 Pa. Superior Ct. 118, 63 A.2d 696 (1949). Other cases indicate that the plaintiff knew in advance of the marriage the precarious mental condition of the defendant, and thus willingly chose the added responsibility of a spouse with unusual needs. *Boggs v. Boggs,* supra; *Fawcett v. Fawcett,* supra.

All the cases cited above reveal a particularly dependent spouse troubled by a nervous condition which causes overreaction to private fears and imagined injuries making self control impossible. In the present case, no such lack of control was demonstrated. The alleged illness was never so debilitating that the defendant was unable to hold a job or function to care for himself. Rather than hospitalization, the treatment prescribed by the medical profession was to aggravate the symptoms of the alleged disease. In addition, the appellant was unaware of her husband's inclinations at her marriage. Considering these circumstances we must hold that refusal to grant the divorce was error.

Decree reversed and a decree of divorce a.v.m. for appellant granted.

SPAETH, J., concurs in the result.

CONCURRING OPINION BY SPAETH, J.:

Every so often a judge finds his legal sense over-whelmed by common sense. He knows he should keep his mind in suspension, and not form an opinion on what should be the outcome of the case until he has researched the law; and yet, no sooner does he hear the facts than he finds himself thinking, "Surely this result must be wrong."

This is such a case. Surely this young woman de-serves a divorce. Her husband's practice of wearing and soiling diapers and rubber pants repulsed her and de-stroyed her affection for him. His transvestite behavior caused her great concern for the mental health of her daughter, and humiliated her in front of friends, family, and in public. Sexual relations ceased altogether.

And yet the President Judge of the lower court, who has at least as much common sense, and more legal ex-perience, than I, felt obliged to deny a divorce. In a thoughtful and sensitive opinion, he summarized his reasons as follows:

> "The evidence in this case falls far short of show-ing settled hate and estrangement by the defendant toward his wife. At the hearing herein he protested his love for his wife and child, and was believed by the undersigned.

> ". . . Defendant's bizarre conduct was the product of a psychiatric disorder. The conduct was not di-rected at the plaintiff and was without any intention of hurting her." Opinion of lower court, at 4-5.

Although the opinion filed by the majority of this court is clearly concerned with reaching a humane result, I do not think it responds to the reasoning of the lower court.

First, the majority seems to accept the lower court's formulation of the law, for like the lower court it cites decisions saying that "the spirit of malevolence, hate and estrangement which has come to replace natural love and

affection in a marriage . . . is central to a charge of indignities." Majority Opinion, at 78, citing *Barr v. Barr*, 232 Pa. Superior Ct. 9, 331 A.2d 774 (1974), and *Sells v. Sells*, 228 Pa. Superior Ct. 331, 323 A.2d 20 (1974). Then, however, after so stating the law, the majority only finds that "the husband's conduct indicates a lack of concern for his wife's well-being and neglect of his responsibility to her and the child." *Id.* at 79. "[L]ack of concern" is far short of "hate and estrangement." If the majority really means that "the spirit of . . . hate and estrangement . . . is central to a charge of indignities", it seems to me that it should have affirmed, not reversed, the order of the lower court.

Second, the majority finds it "difficult to believe there was any recognizable illness [of the husband] in the first place," going on to add: "In this day of growing acceptance of transvestite and homosexual behavior, with sex change operations a commonplace occurrence in many areas, we hesitate to accept the view that mental imbalance is displayed when an individual experiments with one of these concepts." Majority opinion, at 81. I have no such difficulty or hesitancy in this case. To me, the husband is plainly a deeply troubled man; I quite agree with the lower court, that his "bizarre conduct was the product of a psychiatric disorder . . . not directed at . . . and without any intention of hurting [his wife]."

Accordingly, if we are to reverse the order of the lower court—and I agree with the majority that we should—we must re-examine and restate the law, first, on what must be proved to make out a charge of indignities, and second, on when proof of a mental disorder may represent a defense to that charge.

## I

The record here shows estrangement of the parties, but it does not show a "spirit of malevolence, hate." There is no reason to disagree with the findings of the lower court:

"The evidence in this case falls far short of showing settled hate and estrangement by the defendant toward his wife. At the hearing herein he protested his love for his wife and child, and was believed by the undersigned. During the course of his dressing as a woman, and the parties living together, he told his wife that he loved her and his daughter very much. Defendant worked hard, supplied his wife with what he could afford, purchased a new car and furniture for her, did not want her to work preferring that she stay home and care for their child. Their home was open to friends.

"Defendant's bizarre conduct was the product of a psychiatric disorder. The conduct was not directed at the plaintiff and was without any intention of hurting her."[1]

I have concluded, however, that contrary to the conclusions of the lower court and the majority of this court, "hate and estrangement" need not be proved to support a charge of indignities. I grant that this court has frequently made sweeping statements that hate and estrangement are central to the charge of indignities.[2] I myself have been guilty.[3] I submit, however, that the statements will not withstand examination.

Examination must begin with the statute creating the ground of indignities; it makes no mention of "hate" or "malevolence" or "estrangement" but only provides:

---

1. Although we are required to make an independent review of the record, *Dougherty v. Dougherty*, 235 Pa. Superior Ct. 122, 339 A.2d 81 (1975), *Barr v. Barr*, 232 Pa. Superior Ct. 9, 331 A.2d 774 (1974), the lower court's judgment is entitled to great weight since it had the opportunity to observe the witnesses. *Sells v. Sells*, 228 Pa. Superior Ct. 331, 323 A.2d 20 (1974).

2. See, for example, *Boggs v. Boggs*, 221 Pa. Superior Ct. 22, 289 A.2d 479 (1972); *Stewart v. Stewart*, 171 Pa. Superior Ct. 218, 90 A.2d 402 (1952).

3. *Barr v. Barr*, supra.

"1.    When a marriage has been heretofore or shall hereafter be contracted and celebrated between two persons, it shall be lawful for the innocent and injured spouse to obtain a divorce from the bond of matrimony, whenever it shall be judged, in the manner hereinafter provided, that the other spouse:

. . . .

(f)    Shall have offered such indignities to the person of the injured and innocent spouse, as to render his or her condition intolerable and life burdensome. . . ."[4]

Furthermore, the Pennsylvania Supreme Court in its decisions defining indignities has never stated that either hate or estrangement, much less both, are central to a charge of indignities. Instead, echoing the statute, the Supreme Court has held that

"[t]he *essential feature* of the offense of indignities to the person is that it must consist of a course of conduct or continued treatment which renders the condition of the innocent party intolerable and his or her life burdensome. . . ." *Phipps v. Phipps,* 368 Pa. 291, 295, 81 A.2d 523, 525 (1951), *cert. den.* 342 U.S. 942.[5]  (Emphasis supplied.)

Although the Supreme Court, quoting from this court's decision in *Martin v. Martin,* 154 Pa. Superior Ct. 313, 317, 35 A.2d 546, 548 (1943), has acknowledged that "[i]ndignities *may* consist of . . . manifestation[s] of settled hate and estrangement," *McKrell v. McKrell, supra* at 180, 42 A.2d at 612, (emphasis supplied), it has not required that these conditions be present. Rather, it has stated:

"What is meant by such indignities is left undefined in the law, and depends largely upon the cir-

---

4.    Act of May 2, 1929 P.L. 1237, §10, as amended by the Act of March 19, 1943, P.L. 21, §1, 23 P.S. §10.

5.    *Accord, McKrell v. McKrell,* 352 Pa. 173, 42 A.2d 609 (1945).

cumstances of each case; they must consist of such a course of conduct as is humiliating, degrading and inconsistent with the position and relation as a spouse." *Id.* at 180, 42 A.2d at 612.[6]

Thus, if we look only to the statute, as applied by the Supreme Court, we find that to make out a charge of indignities, three elements must be proved: (1) a course of conduct that, although varying according to the circumstances of each case, must in every case (2) be inconsistent with the marital relationship, and (3) render the condition of the innocent party intolerable and his or her life burdensome.

Early decisions of this court are consistent with this statement of the elements of a charge of indignities. For example, in *Breene v. Breene*, 76 Pa. Superior Ct. 568 (1921), it is stated that the charge is made out where there is "any unjustifiable conduct on the part of either the husband or the wife ... which utterly destroys the legitimate ends and objects of matrimony. . . ."[7] *Id.* at 573. Even if "each party has offended against the established proprieties that are expected in the marital relationship," the opinion continues, "there must be some point, beyond which human indulgence cannot be expected to submit, and resort to the courts may rightly be had to sever a relation no longer endurable, and which makes a further living together intolerable and life burdensome." *Id.*

*Breene* was the first case to use the oft-cited passage illustrating what indignities *"may* consist of" (emphasis supplied):

---

6. *Accord, Wick v. Wick,* 352 Pa. 25, 42 A.2d 76 (1945). Except for *Wick, Phipps v. Phipps, supra,* and *McKrell v. McKrell, supra,* are the only cases since 1900 in which the Supreme Court has defined indignities.

7. Although the term "cruelty" is used in the sentence containing this definition, it is nevertheless clear that the definition is of indignities; the terms "cruelty" and "indignities" are rather inaccurately interchanged throughout the opinion.

"... vulgarity, unmerited reproach, habitual contumely, studied neglect, intentional incivility, manifest disdain, abusive language, malignant ridicule, and every other plain manifestation of settled hate and estrangement. ..." 76 Pa. Superior Ct. at 572.[8]

In *Martin v. Martin*, 157 Pa. Superior Ct. 538, 542, 43 A.2d 637, 640 (1945),[9] this passage was without discussion, and I suspect inadvertently, transformed from an illustration into a statement of an essential condition:

"[I]t is not with slight or irregular acts of misbehavior that the law is concerned, but ... there *must* be shown a course of insulting, disdainful, abusive conduct of such intensity and continuity as to indicate that marital harmony has given way to a demonstrated attitude of settled hate and estrangement. *Evans v. Evans*, 152 Pa. Superior Ct. 257, 31 A.2d 590; *Viney v. Viney*, 151 Pa. Superior Ct. 86, 29 A.2d 437." (emphasis supplied).

The cases cited—*Evans* and *Viney*—do not support this statement that both hate and estrangement must be shown; they simply contain *Breene's* illustrative language. Nevertheless, since *Martin* our cases have been hopelessly inconsistent. Some have required proof of hate and estrangement;[10] others have merely suggested that hate-motivated conduct is one example of conduct constituting indignities.[11]

---

8. This passage was quoted by the Supreme Court in *McKrell v. McKrell, supra* at 180, 42 A.2d at 612, although there the Court was quoting from *Martin v. Martin, supra* at 317, 35 A.2d at 548. *See* this opinion *supra* at pp. 86. Curiously, *Martin* did not cite *Breene*.

9. Note that this is a later decision than the *Martin v. Martin* quoted by the Supreme Court and cited in this opinion *supra* at pp. 86 and note 8.

10. *Stewart v. Stewart, supra; Simons v. Simons*, 196 Pa. Superior Ct. 650, 176 A.2d 105 (1961) ; *Boggs v. Boggs, supra.*

11. *Sells v. Sells, supra; Gehris v. Gehris*, 233 Pa. Superior

In these circumstances I would restate the law in the manner already indicated: I would recognize that we have departed from the statute, from the decisions by the Supreme Court, and from our own early decisions, and I would hold that the "essential feature" of a charge of indignities, *Phipps v. Phipps, supra,* is a "course of conduct" that will depend "largely upon the circumstances of each case" but that in every case must be "inconsistent with the position and relation as a spouse," *McKrell v. McKrell, supra,* and render the condition of the injured and innocent spouse "intolerable" and his or her life "burdensome," Act of May 2, 1929, *supra,* 23 P.S. §10.

When this statement of the law is applied here, it is evident that appellant has proved indignities. The sexual identity of one's marital partner is crucial to the marriage relationship. Appellee's transvestite conduct, including his deliberate decision to enter into a treatment program with the goal of having sex change surgery, destroyed the sexual aspect of the marriage. That conduct, along with appellee's infantile behavior, would naturally repulse any "woman of ordinary sensibility and delicacy of feeling."[12] It destroyed appellant's love for appellee, and interfered with the parties' ability to raise their daughter. In short, it constituted a course of conduct that was inconsistent with appellant's position as a spouse and rendered her condition intolerable and her life burdensome.

---

Ct. 144, 334 A.2d 753 (1975). *Dougherty v. Dougherty, supra,* did not mention hatred at all; and *Gerenbeck v. Gerenbeck,* 199 Pa. Superior Ct. 410, 186 A.2d 49 (1962), moderated the requirement by suggesting that actions that would not manifest hatred when engaged in by most divorce litigants might suffice when engaged in by litigants of a "refined background," who are "members of a strict and disciplinary religion."

12. *Commonwealth ex rel. Whitney v. Whitney,* 160 Pa. Superior Ct. 224, 228, 50 A.2d 732, 734 (1947).

## II

The law on when proof of a mental disorder may represent a defense to a charge of indignities is as confusing as the law on what constitutes indignities. As indicated at the beginning of this opinion, the majority avoids this confusion with the observation that "we hesitate to accept the view that mental imbalance is displayed when an individual experiments with [transvestite or homosexual behavior]."

To me this observation seems based on a *non sequitur*. Let us assume for the sake of discussion that homosexual behavior does not display "mental imbalance"; it does not follow that transvestite behavior does not display such imbalance.

So far as I can tell, the professional psychiatric community is undecided on when sexual orientation problems arise from a mental disorder. In December of 1973, the American Psychiatric Association board of trustees voted to stop listing homosexuality as a disease, explaining that: "For a mental condition to be considered a psychiatric disorder, it should either regularly cause emotional distress or regularly be associated with generalized impairment of social functioning; homosexuality does not meet those criteria."[13] However, the Association established a new category of mental disorder called "sexual orientation disturbance" for those "who are either bothered by, in conflict with, or wish to change their sexual orientation."[14] Appellee at least arguably falls within that new category. Indeed I think a fair reading of the lower court's opinion is that he does fall within that category; and I see no reason to disagree with the lower court in this respect. Accordingly, I think we must

---

13. "December 14, 1973 American Psychiatric Association Board of Trustees' Position Statement on Homosexuality and Civil Rights," 131 *American Journal of Psychiatry* 497, April, 1974.

14. *Id.*

face head-on the problem of whether because of his mental disorder appellee is to be excused from his conduct and thereby protected from a successful divorce action.

In approaching this problem, it is important to bear in mind the premises on which the law of divorce in Pennsylvania depends.

In certain special situations, the legislature has provided that a marriage may be dissolved for functional reasons, that is, although neither spouse has done anything wrong, the marriage cannot work, and so should not be continued. Thus, a divorce may be obtained when the defendant spouse "was and still is naturally and incurably impotent, or incapable of procreation,"[15] or "[w]here there is insanity or serious mental disorder which has resulted in confinement in a mental institution for at least three years immediately before the filing of the complaint, where there is no reasonably foreseeable prospect of the defendant spouse's being discharged from in-patient care during the next three years subsequent to the filing of the complaint."[16] Comparable to these provisions is the provision that a divorce may be obtained "[w]hen a marriage has been . . . celebrated between two persons within the prohibited degrees of consanguinity or affinity. . . ."[17] There is also what might be described as a good faith bigamy exception. Thus, a husband may obtain a divorce if he returns after an absence of two years, to find his wife, believing him dead, has remarried; his wife's second marriage is then undisturbed. The same right is given a wife.[18]

Apart from these special situations, however, a divorce may not be obtained in Pennsylvania unless the

---

15. The Divorce Law, Act of May 2, 1929, P.L. 1237, §10, subd. 1(a), as amended, 23 P.S. §10.

16. Act of Sept. 22, 1972, P.L. 880, No. 202, §1, 23 P.S. §10, subd. 4.

17. The Divorce Law, *supra*, §10, subd. 2, 23 P.S. §10, subd. 2.

18. *Id.*, §10, subd. 3, 23 P.S. §10, subd. 3.

plaintiff spouse is "innocent and injured," and the defendant spouse has done something that he or she knew was wrong: "knowingly entered into a second marriage, in violation of ... previous vows"[19]; or "committed adultery"[20]; or "by cruel and barbarous treatment, endangered the life of the injured and innocent spouse"[21]; or "offered such indignities to the person of the injured and innocent spouse"[22]; or "procured the marriage by fraud, force or coercion"[23]; or "been convicted" of certain crimes and "sentenced to imprisonment for ... two years or more."[24] Thus, generally speaking, the right to obtain a divorce in Pennsylvania is defined in punitive terms, which apply to both parties: one who commits any of certain enumerated wrongs may be punished by being divorced from his or her spouse; the punishment may be exacted, however, only by one who is innocent.[25]

Because the law of divorce is defined in punitive terms, it is necessary to have some sort of ameliorative law of excuse. It offends our fundamental sense of fairness to punish a person for intentional misconduct when because of some mental disorder in fact the conduct was not intentional. No sooner, however, does one express this general notion than one realizes that something more precise needs to be said: What does "some mental dis-

---

19. *Id.*, §10, subd. 1(b), 23 P.S. §10, subd. 1(b).

20. *Id.*, §10, subd. 1(c), 23 P.S. §10, subd. 1(c).

21. *Id.*, §10, subd. 1(e), 23 P.S. §10, subd. 1(e).

22. *Id.*, §10, subd. 1(f), 23 P.S. §10, subd. 1(f).

23. *Id.*, §10, subd. 1(g), 23 P.S. §10, subd. 1(g).

24. *Id.*, §10, subd. 1(h), 23 P.S. §10, subd. 1(h).

25. Whether the right to obtain a divorce should be defined in punitive or in functional terms is a subject of considerable debate, in which reasonable persons differ. Nothing said in this opinion is to be read as expressing an opinion on either side of this debate. Such an expression would be both inappropriate and irrelevant; the issues presented must be resolved by the legislature.

order" mean? And what degree of causation is implied by "because"? In short, what standard is to be applied when deciding whether a defendant spouse's misconduct is to be excused because of mental disorder?

There is no standard stated in the Divorce Law, *supra*, 23 P.S. §1 *et seq.* Definition of a standard has therefore been the responsibility of the courts, in particular of this court. I respectfully submit that we have failed in that responsibility. Rather, we have shifted from a strict standard, to a loose one, back to a strict one; and none of the standards is workable.

In *Stewart v. Stewart*, 171 Pa. Superior Ct. 218, 90 A.2d 402 (1952), we affirmed the lower court's refusal of a husband's suit in divorce for indignities because the wife's "conduct resulted from her mental condition." *Id.* at 219, 90 A.2d at 402. It appeared that when the parties married, the wife was "completely normal." *Id.* at 220, 90 A.2d at 403. Shortly after the birth of their child, however, her condition changed, and after a period of treatment for "continued and extreme nervousness," *Id.*, she was committed to a mental hospital, where she was at the time of the master's hearings. Her psychiatrist testified that the "basic reasons" for her condition

> "was 'an arrested psychosexual development, [and] she was unable to meet the adjustments necessary to being a wife and a mother.' He did not find her insane, but stated that 'she manifested certain behavior which is interpretable as being pre-psychotic.' He explained that a 'psychosis entails the loss of intellectual judgment;' that the married state and maternity contributed to her illness." *Id.* at 221, 90 A.2d at 403.

The husband's counsel argued that "since complete insanity was not shown and [she was] at most . . . suffering only a psychosis, she was legally responsible for her conduct, and hence *no impediment to a divorce exist[ed]."* *Id.* This argument, however, was rejected:

"... the cases hold that *conduct which springs from mental ill-health,* whatever its nature or severity, should be regarded as unintentional and lacking the spirit of hate, estrangement, and malevolence, which is the heart of the charge of indignities [collecting cases]. . . .

"Parties to a marriage take each other for better or worse, in sickness and in health . . ., and the inconvenience or even the *mistreatment suffered in consequence of a spouse's ill health* does not constitute a ground for divorce [citations omitted]." *Id.* at 221-22, 90 A.2d at 403-404 (emphasis supplied).

In *Boggs v. Boggs,* 221 Pa. Superior Ct. 22, 289 A.2d 479 (1972),[26] the *Stewart* standard was re-examined. A psychiatrist had testified that the wife, who had petitioned for support, suffered from an " 'acute depressive reaction' illness which . . . could cause elements of impulsivity and immaturity in her behavior. . . ." *Id.* at 27, 289 A.2d at 481. The lower court nevertheless dismissed the petition for support, concluding that the wife's own statements showed that "[i]n no event could her outrageous conduct be ascribed to her depression. There was nothing delusional about this behavior." *Id.* at 28, 289 A.2d at 481. This court, however, remanded with instructions:

"In order for this standard to be applied, the meaning of 'conduct which springs from mental ill-health' must be understood. Literal definitions are, however, not helpful. In excusing conduct which has some relationship to mental illness we have variously described the conduct as excusable because it is 'involuntary', or because it is 'caused' by, 'resulted' from, 'explained' by, or is 'attributable' to emotional or mental imbalance or because in the alternative such imbalance was 'responsible for the conduct.'

---

26. WRIGHT, P.J., dissented.

"However described, the degree of emotional and mental disturbance which excuses conduct, which would constitute indignities if performed by a non-disturbed person, has been set forth in the cases cited in footnotes 1-6, above. [footnotes omitted] These cases involved a variety of fact situations. It is clear from a review of these authorities that a person need not be 'insane' in order for his conduct to be excused. *Stewart v. Stewart, supra.* Such conduct may be excused even if more offensive than that of a wife in the instant case. See *Crock v. Crock, supra* [96 Pa. Superior Ct. 377 (1929)].

"It is sufficient to excuse such conduct if the person performing the conduct suffers from 'a hysterical and neurotic condition' which makes her 'ill and nervous.' *Fawcett v. Fawcett, supra.* [159 Pa. Superior Ct. 185, 48 A.2d 23 (1946)]. Thus, in *Fawcett* we reversed the finding of the lower court that the wife had committed indignities. We held instead that even if she did not suffer from a psychosis or an illness which compel her to act in a certain manner, she may still have a mental or emotional condition which so affects her as to contribute significantly to her offensive behavior. In such circumstances a wife has a defense to the husband's claim that her conduct on its face constitutes grounds for divorce and bars her right to support." *Id.* at 28-29, 289 A.2d at 482.

Having thus stated the standard to be applied, this court turned to the record. It particularly emphasized an observation by the lower court that the husband, who was a doctor, "knew he was marrying a sick woman and maybe thought he could cure her. . . . I am satisfied she has psychiatric problems. She had them long before she married this man. . . ." *Id.* at 31, 289 A.2d at 483. This court concluded:

". . . a wife's conduct will be excusable, even though she is not psychotic and does comprehend the mean-

ing of her acts, *if she is affected by a mental or emotional disturbance which significantly contributes to her offensive behavior* within the meaning of *Fawcett* and the other cases cited above.

"Where the wife demonstrates (1) the existence of mental illness, (2) her husband's knowledge of her mental illness prior to the marriage, and (3) her husband's claim of indignities, as opposed to adultery, the trial court must give proper consideration to all these factors in resolving the question of support." *Id.* (emphasis supplied).

The record was therefore remanded for further proceedings. In a footnote to the order of remand it was stated that "where a wife has raised a prima facie basis for excusing her conduct, as in the instant case, the burden is upon the husband to establish by 'clear and convincing' evidence that the wife's conduct was independent of her mental illness and emotional instability. See *Glass v. Glass, supra,* at 126." *Id.* at 31, n.7, 289 A.2d at 483, n.7.

Pursuant to this remand the lower court held a further hearing, and again denied the wife support. On appeal this court reversed, *Boggs v. Boggs,* 222 Pa. Superior Ct. 209, 294 A.2d 925 (1972),[27] stating:

"... it is apparent from [the wife's] egregious and bizarre behavior, and her frequent psychiatric treatment, that she suffered from an emotional illness. . . .

"The lower court improperly placed the burden upon [the wife] to prove that her illness significantly contributed to her conduct." *Id.* at 211-12, 294 A.2d at 927.

It may be that the holding in the two *Boggs* decisions is somewhat narrowed by the court's emphasis in the first decision on the husband's knowledge of his wife's

---

27. WRIGHT, P.J., dissented.

illness prior to the marriage; even so, the decision plainly represented a loosening of the strict *Stewart* standard: instead of a wife being excused on proof of "conduct which springs from" or is "in consequence of" mental ill health, she is excused "if she is affected by a mental or emotional disturbance which significantly contributes to her offensive behavior." In *Dougherty v. Dougherty*, 235 Pa. Superior Ct. 122, 339 A.2d 81 (1975), however, we appear to have abandoned the *Boggs* decisions, and to have returned to a strict standard—even stricter perhaps than the *Stewart* standard.

In *Dougherty*, the lower court granted a husband's suit in divorce for indignities. On appeal the wife contended that "because she introduced evidence of physical illness, the husband then had the burden of proving that any indignities committed by the wife were not caused by her physical injuries." The wife particularly relied on the statement in the second *Boggs* decision that "she need only submit competent evidence that she suffered from a mental or emotional illness which significantly contributed to her behavior." 222 Pa. Superior Ct. at 211, 294 A.2d at 927. Without discussion of *Boggs*, this argument was rejected:

" '[This] doctrine must not, however, be pushed to extremes. The guilty spouse cannot excuse . . . mistreatment amounting to indignities by the shallow excuse of nervousness or irritability unfounded in any specific ailment. The law still considers the parties as masters of their own conduct *unless legal insanity has intervened . . . or recognizable and definable disease has usurped the will,* and the ill-treatment is but the normal manifestation of the derangement of health.' 2 Freedman, Law of Marriage and Divorce in Pennsylvania §298 (2d Ed. 1957). There must be some showing that the indignities were *caused* [emphasis in original] by the ailment, not merely that a party has suffered from a physical impairment. See *Yeager*

*v. Yeager,* 162 Pa. Super. 263, 57 A.2d 579 (1948); *Freeman v. Freeman,* 127 Pa. Super. 557, 193 A. 99 (1937)." *Id.* at 130, 339 A.2d at 85-86. (emphasis supplied).

Although I joined the opinion in *Dougherty,* I have concluded that it should be disapproved, and that so should *Stewart* and both of the decisions in *Boggs.* None of these cases states a workable standard of excuse. None of them states what is meant by "mental or emotional illness," or "disease," or "disorder"; and none of them explains the degree of causation contemplated by the admonition that the misconduct complained of must "spring from" or be "in consequence of" the illness, or that the illness must "significantly contribute" to the conduct, or that the illness must "usurp the will." Given these ambiguities, and our vacillation from one standard to another, I do not see how the lower courts can decide, or the bar advise, on when misconduct is excusable.

The opinion of the majority in the present case both emphasizes and illustrates the unsatisfactory condition into which the law has drifted. The lower court had no difficulty in concluding that the husband suffered from a mental disorder; and to me, as a matter of common sense, the lower court was right. The problem for the lower court, therefore, was to decide whether the disorder sufficiently caused the husband's misconduct to make it excusable. Applying *Boggs,* rather than *Stewart* or *Dougherty,* the lower court found such causation. The majority of this court, however, without defining what it means by "mental illness," states that "[r]ather than mental illness, we must view the husband's predilection as the indulgence of a private fantasy." Majority opinion at 81-82. The majority further states that in any case, "we remain unconvinced ... that [the husband] was *compelled* by mental illness to adopt the pattern of living he displayed." *Id.* (emphasis supplied). Here, I take it, the majority is applying *Dougherty* (the illness must "usurp

the will"), which it cites and quotes, although it also cites *Boggs.*

In my view, we must do better, and I think we can if we will but consult the experience of the criminal law.

The criminal law and the law of divorce are parallel in that both require proof of deliberate misconduct. Just as it offends our fundamental sense of fairness to punish a person by divorcing him, when his misconduct was not intentional because of some mental disorder, so it does to punish him by convicting him of crime. Without undertaking a complete exposition, generally it may be stated that the criminal law has devised several standards by which misconduct may be excused. One standard is the rule of *The Queen v. M'Naghten,* 10 Cl. & Fin. 200, 8 Eng. Rep. 718 (1843): criminal intent is lacking if the defendant was incapable of knowing what he was doing, or did know but was incapable of judging that it was wrong. Another standard is the rule of *Durham v. United States,* 214 F.2d 862 (D.C. Cir. 1954): a person is not responsible for a criminal act if the act was the product of mental disease or mental defect. A third standard is the American Law Institute's test: a person is not responsible for a criminal act if as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

These standards, and the difficulties experienced in applying them, are discussed in the several opinions filed in *United States v. Brawner,* 471 F.2d 969 (D.C. Cir. 1972), and *Commonwealth v. Simms,* 228 Pa. Superior Ct. 85, 324 A.2d 365 (1974). In *Simms,* I concluded that none of these standards was workable. Instead, following the lead of Chief Judge BAZELON in dissent in *Brawner,* and Mr. Justice BOK in dissent in *Commonwealth v. Woodhouse,* 401 Pa. 242, 264-67, 164 A.2d 98, 109-111 (1960), I concluded that the standard we should adopt was " 'whether under all of the circumstances, including [the defendant's] mental derangement as and if

the jury sees it, it would be just to hold [the defendant] accountable.'" *Commonwealth v. Simms, supra* at 111, 324 A.2d at 385, concurring opinion by SPAETH, J., quoting Mr. Justice BOK'S dissenting opinion in *Commonwealth v. Woodhouse, supra* at 266, 164 A.2d at 110.

I think the same standard should be applied in the law of divorce. Until we do, we shall never escape the definitional problems that we have encountered in trying to explain what we mean by "mental illness," or how much causation we require to be proved between that illness and the misconduct complained of. Rather than elaborate on this conclusion, I refer the reader, as I did in my opinion in *Simms,* to Chief Judge BAZELON'S dissenting opinion in *Brawner*; I remain persuaded by it.

Briefly, the reasoning is as follows: It is not useful to speak in such terms as "mental illness." First, medical history reflects considerable, and changing, disagreement about what constitutes "mental illness." And second, such usage may exclude certain disabilities. Suppose, for example, that the defendant has an epileptoid disorder. Is the determination of his responsibility to turn on the outcome of a debate whether epilepsy is a "mental" or "physiological" illness? It is also not useful to speak in terms of a causative relationship between a given mental illness and a given course of misconduct. Sometimes this way of speaking will do no harm. For example, "[i]f the defendant cannot distinguish 'good and evil,' i.e., if he 'doth not know what he is doing, no more than *** a wild beast,' [footnote omitted], he may well lack the capacity to appreciate the wrongfulness of *any* act or to conform *any* act to the requirements of the law. In that case, a jury is likely to conclude that the defendant's impairment 'caused' his act, irrespective of the act he allegedly committed." *United States v. Brawner, supra,* at 1023-24, BAZELON, C.J., dissenting. The difficulty will arise when the defendant's impairment has a significant impact on some aspects of his behavior, while otherwise leaving his personality intact. In such cases, to make the

determination of responsibility turn upon a finding of "causation" is to surrender to the psychiatrists. Because a psychiatrist testifies that misconduct has, or has not, been "caused" by a "mental illness" should not be dispositive. The doctrine of responsibility is not a medical but a legal, or philosophical, doctrine. It is a " 'complicated ... decision ... intertwining moral, legal, and medical judgments,'. ... The 'moral' elements of the decision are not defined exclusively by religious considerations but by the *totality of underlying conceptions of ethics and justice shared by the community, as expressed by its jury surrogate*. [Emphasis added; citations omitted]" *Id.* at 1031 (Quoting the majority opinion at 982).

If we apply the standard enunciated by Mr. Justice BOK in *Woodhouse* and by Chief Judge BAZELON in *Brawner* to the present case, and ask whether it is just to hold appellee accountable for his misconduct, the answer is readily reached. It is just.

Appellant was only sixteen years old when the parties met, appellee only twenty. After knowing one another for only three months, they eloped. Shortly after their marriage, appellee began to exhibit infantile behavior; before that time appellant knew nothing of any emotional problems appellee might have. She was so shocked and confused by appellant's new behavior that she disclosed it to no one.

When the parties' baby was born a year later, appellee ceased his infantile behavior. Soon, however, he expressed the desire to dress as a woman, and began to do so occasionally at home. Also, he obtained literature on transsexualism and sex change surgery, consulted doctors on the possibility of sex change, and began to take hormones to develop himself as a woman.

Once more upset by appellee's behavior and worried about its effect on their daughter, appellant urged appellee to seek psychiatric help. Himself afraid of the potentially adverse effect on his daughter, appellee deliberately hid his conduct from her (although not from

appellant). Apparently also aware that his job might be affected, he refrained from dressing as a woman during working hours. Nevertheless, after only a few visits to the psychiatrist, appellee discontinued therapy and instead entered into a six month course of treatment leading toward sex change surgery.

Three months later, appellant, still afraid for her daughter, and herself so emotionally distraught that she required medical attention, requested a separation. Thereafter, at a support hearing, appellee made one of his apparently rare public appearances as a woman, and insisted upon being called "Karen." By this time the marital relationship had been destroyed. (See Part I, *supra.*) Appellee's subsequent cessation of transvestitism could not restore it.

Although appellee's conduct had a destructive impact on his marriage, he managed other aspects of his life more successfully. He remained able to care for his physical and personal needs and to manage his financial affairs. He was able to hold a job throughout the relevant period, and was able to provide material benefits for himself and his family (*e.g.,* a new car and new furniture). Furthermore, after the separation, he ceased his disturbed conduct altogether.

Taking into account all of these circumstances, appellee will not be unjustly treated if held accountable for his conduct. True, he has suffered from a mental derangement, and this weighs against holding him accountable. This circumstance, however, is more than balanced by the others. Because of appellee's conduct the marital relationship has been destroyed; a divorce will recognize this destruction. In thus freeing the parties from the bonds of a stifling relationship, appellee will not be treated with undue severity; he is and has been physically and financially independent.

I therefore concur in the reversal of the lower court's decree and in granting of a divorce a.v.m. for appellant.